801 S.E.2d 713

The STATE, Respondent,

v.

Ricky Lee BLACKWELL, Appellant.

Appellate Case No. 2014-000610
Opinion No. 27722

Supreme Court of South Carolina.

Heard April 13, 2016
Filed May 31, 2017

130

Chief Appellate Defender Robert Michael Dudek and Appellate Defender David Alexander, both of Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Chief Deputy Attorney General John W. McIntosh, Deputy Attorney General Donald J. Zelenka, and Senior Assistant Deputy Attorney General Melody J. Brown, all of Columbia, and Solicitor Barry J. Barnette, of Spartanburg, for Respondent.

Meliah Bowers Jefferson, of Wyche, P.A., of Greenville, for Amicus Curiae National Crime Victim Law Institute. Lindsey D. Jacobs and Patricia Revenhorst, both of Greenville, for Amicus Curiae South Carolina Victim Assistance Network.

## CHIEF JUSTICE BEATTY:

This is a consolidated direct appeal and mandatory review from a sentence of death.[1] A jury convicted Ricky Lee Blackwell of kidnapping and killing eight-year-old Heather Brooke Center ("Brooke"), the daughter of his ex-wife's boyfriend, and recommended a sentence of death. Following sentencing, Blackwell appealed to this Court. In his appeal, Blackwell contends the trial court erred in: (1) finding him eligible for the death penalty despite evidence of mental retardation;[2] (2) failing to disqualify a juror for cause; (3) denying his *Batson*[3] challenge; (4) prohibiting him from cross-examining a State witness using privileged statements the witness made to a mental health counselor and declining to accept the proffer of the mental health records as an exhibit; (5) declining to admit notes of two hospital chaplains as evidence that he was remorseful; and (6) failing to correctly instruct the jury regarding a finding of mental retardation during the penalty

---

1. S.C. Code Ann. § 16-3-25(F) (2015).

2. Although the General Assembly has since changed this term to "intellectual disability" in other titles of the South Carolina Code, we have used the term "mental retardation" for consistency purposes as it was in effect and used during these trial proceedings. *See* S.C. Code Ann. § 16-3-20(C)(b)(10) (2015) (identifying "mental retardation" as a statutory mitigating circumstance in capital-sentencing proceedings); *cf.* S.C. Code Ann. § 44-20-30 (Supp. 2011), amended by Act No. 47, 2011 S.C. Acts 172, § 13 ("Section 13. In Sections 1 through 6 of this act, the terms 'intellectual disability' and 'person with intellectual disability' have replaced and have the same meanings as the former terms 'mental retardation' and 'mentally retarded.' ").

3. *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

phase of the trial. For reasons that will be discussed, we affirm Blackwell's convictions and sentence of death.

## I. Factual / Procedural History

After twenty-six years of marriage, Blackwell's wife, Angela, entered into an adulterous relationship with Bobby Center in 2008. By all accounts, Blackwell was devastated when Angela left him. Following the breakup, Blackwell attempted suicide, suffered financial problems, and was forced to turn to his parents for support.

According to Angela, on July 8, 2009, Blackwell came to her parents' house to discuss insurance matters. While there, Blackwell chastised her about not visiting their grandsons and urged her to go see them that day. Angela testified she was going to take Brooke swimming at Center's house that day and intended to pick up her grandsons to take them along. When she arrived at her daughter's home, she did not see her daughter's car. Assuming that her daughter was not home, Angela began to drive away. As she was leaving, Blackwell flagged her down and informed her that their daughter went to the store but that their son-in-law had the children. Angela testified she got out of the car to secure a dog in order that it would not bite Brooke. When Angela turned around, she saw that Blackwell had grabbed Brooke and was holding a gun to the child. Blackwell ignored Angela's pleas for him to release Brooke. Instead, Blackwell stated that Angela had "pushed this too far," that she "did this," and that she could let him know "what Bobby thinks of this." Blackwell then fatally shot Brooke. Following the shooting, Blackwell fled into the woods behind his daughter's home. When law enforcement surrounded him, Blackwell shot himself in the stomach and was taken to the hospital. While being transported to the hospital and waiting for treatment, Blackwell gave inculpatory statements to the law enforcement officers who questioned him.

After a Spartanburg County grand jury indicted Blackwell for kidnapping and murder, the State served Blackwell with notice that it intended to seek the death penalty. Blackwell was evaluated, at the request of defense counsel, and deemed competent to stand trial. Approximately three years later, defense counsel claimed that Blackwell is mentally retarded and, thus, ineligible to receive the death penalty pursuant to

*Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).[4] As a result, the trial court conducted a hearing pursuant to *Franklin v. Maynard*, 356 S.C. 276, 588 S.E.2d 604 (2003).[5] The court ruled that Blackwell failed to prove he is mentally retarded and the case proceeded as a capital jury trial.

The jury found Blackwell guilty of kidnapping and murder. At the conclusion of the penalty phase of the trial, the jury specifically found, *via* a special verdict form, that Blackwell is not mentally retarded. The jury recommended a sentence of death, finding the State proved the aggravating circumstances that the murder involved a child under the age of eleven and was committed while in the commission of kidnapping.[6] The trial court sentenced Blackwell to death for murder, noting the kidnapping sentence was subsumed into the sentence for murder.[7]

Following the denial of his post-trial motions, Blackwell appealed his convictions and sentence to this Court.

## II. Standard of Review

"In criminal cases, this Court sits to review errors of law only and is bound by factual findings of the trial court unless an abuse of discretion is shown." *State v. Laney*, 367 S.C. 639, 643, 627 S.E.2d 726, 729 (2006). An abuse of discretion occurs when the court's decision is unsupported by the evidence or controlled by an error of law. *State v. Black*, 400 S.C. 10, 16, 732 S.E.2d 880, 884 (2012).

---

4. *See Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (holding that the Eighth Amendment's cruel and unusual punishment clause prohibits the government from imposing a death sentence on a person who is mentally retarded).

5. *See Franklin v. Maynard*, 356 S.C. 276, 588 S.E.2d 604 (2003) (adopting state court procedure in compliance with *Atkins'* prohibition on executing mentally retarded defendants).

6. S.C. Code Ann. § 16-3-20(C)(a)(1)(b), (a)(10) (2015).

7. The judge did not impose a sentence for the kidnapping charge since Blackwell had been sentenced for the related murder. S.C. Code Ann. § 16-3-910 (2015).

## III. Discussion

### A. Pre-Trial *Atkins* Determination

Blackwell argues the trial court erred in making the pre-trial determination that he was eligible for the death penalty given the evidence "conclusively demonstrated" that he is mentally retarded. Consequently, Blackwell maintains that by proceeding as a capital case and ultimately sentencing him to death, the trial court violated his rights under the Eighth Amendment[8] as interpreted by the United States Supreme Court ("USSC") in *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) and adopted by this Court in *Franklin v. Maynard*, 356 S.C. 276, 588 S.E.2d 604 (2003).[9]

After Blackwell's counsel advised the State and the trial court that he would assert that Blackwell is mentally retarded and, thus, exempt from the death penalty, the trial court held a pre-trial hearing pursuant to *Franklin*. During this hearing, the court heard testimony from three mental health experts: (1) Dr. Kimberly Harrison, a forensic psychologist with the South Carolina Department of Mental Health ("SCDMH") who was offered by the State, testified that she had evaluated Blackwell, deemed him competent to stand trial, and did not discern any evidence of mental retardation; (2) Dr. Ginger Calloway, a forensic psychologist who was offered by the

8. U.S. Const. amend. VIII ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.").

9. As a threshold matter, we disagree with the State's claim that Blackwell's issue is procedurally barred or, alternatively, moot based on the jury's finding during the penalty phase that Blackwell is not mentally retarded. As evidenced by this Court's decision in *Franklin*, a judge's pre-trial determination and a jury's determination are separate and distinct findings. *See Franklin*, 356 S.C. at 279, 588 S.E.2d at 606 (recognizing that if the trial judge makes a pre-trial determination that the defendant is not mentally retarded, the defendant may present evidence of mental retardation to the jury during the penalty phase). Thus, like other pre-trial determinations, such as the denial of a defendant's claim of immunity under the South Carolina Protection of Persons and Property Act, we find the issue is proper for our review. *Cf. State v. Curry*, 406 S.C. 364, 370, 752 S.E.2d 263, 266 (2013) ("A claim of immunity under the Act requires a pretrial determination using a preponderance of the evidence standard, which this court reviews under an abuse of discretion standard of review.").

defense, opined that Blackwell met the definition of "mental retardation" because he exhibited: sub-average intellectual ability based on his I.Q. scores; significant deficits in adaptive functioning such as communication, home living, social interaction, self-direction, and functional academics; and that these deficits existed prior to the age of eighteen; and (3) Dr. Gordon Brown, a forensic psychologist employed with the SCDMH who was offered by the State to rebut Dr. Calloway's opinion, opined that Blackwell did not meet the criteria for mental retardation.

Following the hearing, the court considered the voluminous evidence that formed the basis of the experts' conclusions and reports, which included Blackwell's school records, I.Q. scores, employment records, medical and mental health records, records from Blackwell's immediate family, and interviews with several of Blackwell's family members and acquaintances.

By written order, the trial court ruled that, while there were several factors that would "raise the possibility of mental retardation," Blackwell had failed to prove by the preponderance of the evidence that he was ineligible to receive the death penalty. As will be discussed, we are unpersuaded by Blackwell's claim that the trial court committed reversible error in rendering the pre-trial *Atkins* determination.

In *Atkins*, the USSC held the execution of a mentally retarded person is cruel and unusual punishment prohibited by the Eighth Amendment to the United States Constitution, which is applicable to the states through the Fourteenth Amendment. *Atkins*, 536 U.S. at 321, 122 S.Ct. 2242. However, the USSC in "*Atkins* 'did not provide definitive procedural or substantive guides for determining when a person who claims mental retardation' falls within the protection of the Eighth Amendment." *Hall v. Florida,* —— U.S. ——, 134 S.Ct. 1986, 1998, 188 L.Ed.2d 1007 (2014) (quoting *Bobby v. Bies*, 556 U.S. 825, 831, 129 S.Ct. 2145, 173 L.Ed.2d 1173 (2009)). Instead, the USSC left to the states "the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." *Atkins*, 536 U.S. at 317, 122 S.Ct. 2242 (quoting *Ford v. Wainwright*, 477 U.S. 399, 405, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986)).

Our General Assembly has defined "mental retardation" to mean "significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the developmental period." *See* S.C. Code Ann. § 16-3-20(C)(b)(10) (2015). While this Court has strictly adhered to this statutory definition, it has recognized that the USSC in *Atkins* "relied on a clinical definition of intellectual disability which required not only sub-average intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that manifested before age eighteen." *State v. Stanko*, 402 S.C. 252, 286, 741 S.E.2d 708, 726 (2013).

Further, this Court has outlined the procedure for the determination of whether a defendant is mentally retarded under *Atkins*. *Franklin v. Maynard*, 356 S.C. 276, 588 S.E.2d 604 (2003). In *Franklin* we explained that:

the trial judge shall make the determination in a pre-trial hearing, if so requested by the defendant or the prosecution, after hearing evidence, including expert testimony, from both the defendant and the State. The defendant shall have the burden of proving he or she is mentally retarded by a preponderance of the evidence.

If the judge finds the defendant to be mentally retarded by a preponderance of the evidence in the pre-trial hearing, the defendant will not be eligible for the death penalty. If, however, the judge finds the defendant is *not* mentally retarded and the jury finds the defendant guilty of the capital charge, the defendant may still present mitigating evidence that he or she had mental retardation at the time of the crime. *See* S.C. Code Ann. § 16-3-20(C)(b)(10) (2003). If the jury finds this mitigating circumstance, then a death sentence will not be imposed.

*Franklin*, 356 S.C. at 279, 588 S.E.2d at 606 (footnote and citations omitted); *see State v. Laney*, 367 S.C. 639, 649, 627 S.E.2d 726, 732 (2006) (concluding that "mental retardation is a threshold issue, decided by the trial judge as a matter of law in a pre-trial hearing, that determines whether a defendant is eligible for capital punishment at all").

Although this Court has established the procedural guidelines for a pre-trial *Atkins* determination, it has never ex-

pressly enunciated the appellate standard of review. We conclude, as have other jurisdictions, that a pre-trial *Atkins* determination is analogous to a preliminary finding of whether a defendant is competent to stand trial and, thus, should be reviewed under the same appellate standard. *See State v. Maestas*, 298 Kan. 765, 316 P.3d 724 (2014) (concluding that preliminary finding that there is "reason to believe" the defendant is mentally retarded is comparable to the preliminary "reason to believe" finding of whether a defendant is competent to stand trial and determining that the same appellate standard of review should apply to both initial determinations); *see also Franklin*, 356 S.C. at 279, 588 S.E.2d at 606 (comparing defendant's burden of proving that he or she is mentally retarded with defendant's burden of proving incompetence by a preponderance of the evidence).

As a result, we hold that a trial judge's ruling regarding an *Atkins* determination will be upheld on appeal if supported by the evidence and not against its preponderance. *Cf. State v. Weik*, 356 S.C. 76, 81, 587 S.E.2d 683, 685 (2002) ("The defendant bears the burden of proving his lack of competence [to stand trial] by a preponderance of the evidence, and the trial judge's ruling will be upheld on appeal if supported by the evidence and not against its preponderance."); *see State v. Strode*, 232 S.W.3d 1, 8 (Tenn. 2007) ("When an accused is afforded an evidentiary hearing on the merits of a motion [to determine whether the defendant was mentally retarded at the time of the offense] in the trial court, the findings of fact made by that court are binding upon the appellate court unless the evidence contained in the record preponderates against those findings.").

Employing this standard of review, we now analyze the trial court's *Atkins* determination. Although Blackwell suggests the trial court committed an error of law in reaching its conclusion, he fails to identify any specific error. Instead, he expresses his disagreement with the trial court's credibility determinations and the weight afforded to the experts' opinions and then appears to argue that these decisions equate to errors of law. Because the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony, we must defer to the court's determinations. *See*

*State v. Kelly*, 331 S.C. 132, 149, 502 S.E.2d 99, 108 (1998) (recognizing, in reviewing a trial judge's determination of a defendant's competency to stand trial, that the judge is the sole judge of the credibility of the witnesses and the weight to be given their testimony and is entitled to evaluate conflicting testimony).

 Further, as we discern no legal error,[10] we believe Blackwell merely seeks for this Court to re-evaluate the testimony and evidence presented during the pre-trial *Atkins* proceedings. Under this Court's highly deferential standard of review, we find the trial court correctly determined that Blackwell failed to prove by a preponderance of the evidence that he is mentally retarded and, thus, ineligible to receive the death penalty.

Initially, we note the trial court correctly identified and made its determination applying the statutory definition of "mental retardation." Moreover, contrary to Blackwell's claim, the trial court did not base its decision solely on the fact that Blackwell was able to successfully obtain a commercial driver's license and be employed as a truck driver. The court relied on other factors, including Blackwell's school performance and full employment history. Additionally, the court explained why it gave greater weight to Dr. Brown's report, noting that the report was directed at an evaluation of Blackwell's "formative years" and was consistent with the "functional adaptions" required by the statutory definition of "mental retardation." The court also discounted some of Dr. Calloway's findings as it questioned whether "adequate information" was used and believed Dr. Calloway improperly "made subjective determina-

10. Blackwell does argue that the trial court's ruling conflicts with the USSC's decision in *Hall v. Florida*, — U.S. ——, 134 S.Ct. 1986, 188 L.Ed.2d 1007 (2014), which held unconstitutional a Florida statute, as interpreted by the Florida Supreme Court, foreclosing further consideration of a capital defendant's intellectual disability if his I.Q. score is more than 70. However, *Hall* does not, as Blackwell proposes, alter the methodology a state court uses to make an *Atkins* determination. In *Hall*, the USSC found that an *Atkins* determination should not be based strictly on an I.Q. score but should also take into consideration other evidence, including the opinions of medical experts. Here, the trial court complied with *Hall* as it properly followed the procedure adopted by this Court in *Franklin* and considered the medical experts' opinions in conjunction with the statutory definition of "mental retardation."

tions concerning the results obtained and weighted responses of various informants differently."

We also find the trial court's factual determinations are supported by evidence in the record. Admittedly, it is concerning that Blackwell, at 54 years old, scored 63 and 68 on the I.Q. tests given in preparation of the *Atkins* hearing. However, in terms of "significantly sub-average general intellectual functioning," the trial court readily acknowledged the recent I.Q. scores but was persuaded by evidence that: (1) Blackwell, *prior to the age of 18*, scored between 68 and 87 on standard school I.Q. tests; (2) Blackwell made "reasonably sufficient grades during his school career"; (3) at the age of 18, Blackwell was found to read at the 5.8 grade level, completed arithmetic problem solving at the 6.6 level, and completed arithmetic computation at the 5.2 level; and (4) Blackwell dropped out of high school in the eleventh grade despite having earned significant credits toward graduation.

The court also recognized that Blackwell's recent I.Q. scores may have been caused by events in his adult life that adversely affected his current cognitive ability. For example, the court accurately referenced the fact that Blackwell received chemotherapy for Hodgkin's Lymphoma in 1986, had an accident in 2003 or 2004 while riding a four wheeler which rendered him unconscious for approximately 15 to 20 minutes, had several major depressive episodes that resulted in involuntary commitments in 1990 and 2008, and was taking Thorazine, an antipsychotic medication, at the time of his *Atkins* evaluation.

With respect to Blackwell's adaptive behavior, the court found "no evidence that he was unable to function at his home during the time before his eighteenth birthday." Although the court acknowledged evidence that Blackwell had difficulty living independently after the dissolution of his marriage, the court declined to find this translated into deficits in Blackwell's adaptive behavior. Rather, the court accepted the testimony of Dr. Calloway that Blackwell's major depressive episodes after the separation were the cause of Blackwell's inability to function normally. The court also found that Blackwell adapted to life well as he was able to achieve his goal of becoming a commercial truck driver, maintain employment with consistent increases in his earnings, and raise two chil-

dren during his twenty-six-year marriage.[11] Additionally, the court found significant the fact that Blackwell was never diagnosed with mental retardation until the *Atkins* issue was raised and also noted that Dr. Harrison, who evaluated Blackwell as to his competency to stand trial, reported no finding of mental retardation.

After thoroughly reviewing the record, we conclude Blackwell has not shown the trial court committed an error of law or that its decision is unsupported by the evidence or against its preponderance. Accordingly, we find the case properly proceeded as a capital trial.[12]

---

11. Although the trial court did not have the benefit of the USSC's recent decision in *Moore v. Texas*, —— U.S. ——, 137 S.Ct. 1039, 197 L.Ed.2d 416 (2017), we find the court's analysis comports with this decision. In *Moore*, the defendant was convicted of capital murder and sentenced to death for fatally shooting a store clerk during a robbery that occurred when the defendant was twenty years old. *Id.* at 1044. Subsequently, the defendant sought state habeas relief. *Id.* Pursuant to *Atkins* and *Hall*, a Texas habeas court determined that the defendant was intellectually disabled and, therefore, recommended to the Texas Court of Criminal Appeals ("CCA") that the defendant be granted relief. *Id.* at 1045-46. The CCA disagreed with the recommendation and found the habeas court erred by not following the CCA's decision in *Ex Parte Briseno*, 135 S.W.3d 1 (Tex. Crim. App. 2004), wherein the CCA adopted the definition of and standards for assessing intellectual disability based on a 1992 edition of the American Association on Mental Retardation manual. *Id.* at 1046. The USSC granted certiorari "to determine whether the CCA's adherence to superseded medical standards and its reliance on *Briseno* comply with the Eighth Amendment" and the Court's precedents. *Id.* at 1048. The USSC vacated the CCA's judgment, finding "[t]he CCA's consideration of [the defendant's] adaptive functioning ... deviated from prevailing clinical standards and from the older clinical standards the court claimed to apply." *Id.* at 1050. Further, the USSC rejected the CCA's use of the *Briseno* factors, which the Court deemed an "invention of the CCA untied to any acknowledged source." *Id.* at 1044.

Here, the trial court made no reference to the impermissible *Briseno* factors. Furthermore, given the fact that Blackwell's I.Q. scores were at the lower end of the spectrum, the court correctly considered Blackwell's adaptive functioning using the current clinical standards presented by the medical experts. The court, as required by *Moore*, carefully considered and weighed Blackwell's adaptive strengths against his adaptive deficits. While the dissent may believe the trial court overemphasized Blackwell's adaptive strengths, any significance assigned to these adaptive strengths was based on the court's assessment and credibility determination of the expert testimony.

12. The dissent agrees there is evidence to support the trial court's

## B. Jury Selection

With respect to jury selection, Blackwell contends the trial court erred in qualifying a juror and denying his *Batson* challenge to the State striking two African-American male jurors.

### 1. Capital Juror Qualification

Blackwell asserts the trial court erred in qualifying Juror 43. Based on Juror 43's responses during *voir dire*, Blackwell claims the juror was opposed to considering all categories of mitigating evidence, particularly a defendant's background, and mistakenly believed the defense had the burden of proving Blackwell deserved a life sentence rather than the death penalty.

In reviewing an error as to the qualification of a juror, this Court engages in a three-step analysis. *State v. Green*, 301 S.C. 347, 352, 392 S.E.2d 157, 159 (1990). First, an appellant must show that he exhausted all of his peremptory challenges. *Id.* Second, if all peremptory challenges were used, this Court must determine if the juror was erroneously qualified. *Id.* at 352, 392 S.E.2d at 160. Third, if the juror was erroneously qualified, an appellant must demonstrate this error deprived him of a fair trial. *Id.*

"A prospective juror may be excluded for cause when his or her views on capital punishment would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *State v. Woods*, 382 S.C. 153, 159, 676 S.E.2d 128, 131 (2009); S.C. Code Ann.

conclusion; however, it finds the decision is against the preponderance of the evidence. In reaching this conclusion, the dissent disregards our deferential standard of review and effectively acts as a trial court rather than an appellate court. Specifically, the dissent improperly makes credibility determinations and evaluates the reliability of the evidence. For example, the dissent: "find[s] most credible, Dr. Calloway"; notes that the "State's expert and the trial judge ... rely on unreliable school records"; "discount[s] the testimony of the State's experts"; and characterizes Dr. Harrison's conclusion as "demonstrably flawed." Although the dissent may disagree with the trial court's pre-trial *Atkins* determination, it cannot supplant the role of the trial court to judge the credibility of the witnesses, to weigh their testimony, and to evaluate conflicting testimony.

§ 16-3-20(E) (2015) (providing that a juror may not be excused in a death penalty case unless the juror's beliefs or attitudes against capital punishment would render the juror unable to return a verdict according to law).

■■■■■ "When reviewing the trial court's qualification or disqualification of prospective jurors, the responses of the challenged juror must be examined in light of the entire *voir dire.*" *Woods*, 382 S.C. at 159, 676 S.E.2d at 131. "The determination whether a juror is qualified to serve in a capital case is within the sole discretion of the trial judge and is not reversible on appeal unless wholly unsupported by the evidence." *Id.*

■■ After reviewing the entire *voir dire* and giving due deference to the trial court, we find Juror 43's responses do not demonstrate that she was unable to render a verdict according to law.[13] During *voir dire*, Juror 43 repeatedly acknowledged that the State always had the burden of proof in a criminal case. In terms of sentencing, she characterized herself as the type of juror who would decide between a sentence of death or life imprisonment after considering the aggravating and mitigating factors.

Though she did express her concern that "something needs to be done" about repeat offenders, she recognized the finality of a sentence of life imprisonment without the possibility of parole and that it could be an appropriate punishment. Further, even though she seemed to minimize a defendant's difficult background as a mitigating factor, stating "I know everybody's life is hard," she later clarified that in determining a sentence "you have to hear everything and work it out."

Additionally, although Juror 43's initial responses to defense counsel appear to indicate her belief that the defense had to prove why a life sentence was the appropriate penalty, she later expressed her understanding that "the defendant never has a burden of proof." Finally, as noted during the trial court's ruling, at the time Juror 43 gave her responses she had

---

13. The State asserts Blackwell is procedurally barred from raising this issue because, at the time Juror 43 was presented as a potential juror, he had not exhausted all of his peremptory challenges. However, we need not engage in this step of the analysis as we find no error in the trial court's decision to qualify Juror 43.

not been instructed by the court as to the correct burden of proof.

Because Juror 43 repeatedly affirmed that she would listen to and apply the law as instructed by the trial court, we conclude that certain questionable responses during *voir dire* did not disqualify her from service on a capital case or deny Blackwell a fair trial. Accordingly, we find the trial court did not abuse its discretion in denying Blackwell's motion to excuse Juror 43 for cause. *See State v. Stanko*, 402 S.C. 252, 276, 741 S.E.2d 708, 720 (2013) (holding trial judge did not err in qualifying juror in capital case, despite the juror's responses that she would always vote for the death penalty when murder and an aggravating circumstance were proven beyond a reasonable doubt, where the overall balance of her answers "demonstrate[d] an ability and willingness to be impartial and carry out the law as explained to her").

### 2. *Batson* Challenge

Blackwell argues the trial court erred in denying his *Batson* challenge to the State striking two African-American male jurors, Juror 45 and Juror 79. Specifically, Blackwell claims the State failed to present racially neutral reasons for striking these jurors given the State did not strike similarly situated Caucasian jurors, who also had criminal records and expressed "pro-life" sentiments during *voir dire*.

"The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits the striking of a venire person on the basis of race or gender." *State v. Shuler*, 344 S.C. 604, 615, 545 S.E.2d 805, 810 (2001) (citing *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986)).

"The United States Supreme Court has set forth a three-step inquiry for evaluating whether a party executed a peremptory challenge in a manner which violated the Equal Protection Clause." *State v. Inman*, 409 S.C. 19, 26, 760 S.E.2d 105, 108 (2014). In *Giles*, this Court outlined the steps as follows:

First, the opponent of the peremptory challenge must make a prima facie showing that the challenge was based on race. If a sufficient showing is made, the trial court will move to

the second step in the process, which requires the proponent of the challenge to provide a race neutral explanation for the challenge. If the trial court finds that burden has been met, the process will proceed to the third step, at which point the trial court must determine whether the opponent of the challenge has proved purposeful discrimination. The ultimate burden always rests with the opponent of the challenge to prove purposeful discrimination.

*State v. Giles*, 407 S.C. 14, 18, 754 S.E.2d 261, 263 (2014) (internal citations omitted). "Step two of the analysis is perhaps the easiest step to meet as it does not require that the race-neutral explanation be persuasive, or even plausible." *Inman*, 409 S.C. at 26, 760 S.E.2d at 108. As explained in *Giles*:

in order for the explanation provided by the proponent of a peremptory challenge at the second stage of the *Batson* process to be legally sufficient and not deny the opponent of the challenge, as well as the trial court, the ability to safeguard the right to equal protection, it need not be persuasive, or even plausible, but it must be clear and reasonably specific such that the opponent of the challenge has a full and fair opportunity to demonstrate pretext in the reason given and the trial court to fulfill its duty to assess the plausibility of the reason in light of the evidence bearing on it.

*Giles*, 407 S.C. at 21-22, 754 S.E.2d at 265.

"In contrast, step three of the analysis requires the court to carefully evaluate whether the [opponent of the peremptory challenge] has proven racial discrimination by demonstrating that the proffered race-neutral reasons are mere pretext for discriminatory intent." *Inman*, 409 S.C. at 27, 760 S.E.2d at 108. "During step three, [the opponent of the peremptory challenge] should point to direct evidence of racial discrimination, such as showing that the [proponent of the peremptory challenge] struck a juror for a facially neutral reason but did not strike a similarly-situated juror of another race." *Id.* at 27, 760 S.E.2d at 108-09. "In doing so, the party proves that the 'original reason was pretext because it was not applied in a neutral manner.' " *Id.* at 27, 760 S.E.2d at 109

(quoting *State v. Oglesby*, 298 S.C. 279, 281, 379 S.E.2d 891, 892 (1989)).

"Whether a *Batson* violation has occurred must be determined by examining the totality of the facts and circumstances in the record." *Shuler*, 344 S.C. at 615, 545 S.E.2d at 810. "The trial court's findings regarding purposeful discrimination are accorded great deference and will be set aside on appeal only if clearly erroneous." *State v. Haigler*, 334 S.C. 623, 630, 515 S.E.2d 88, 91 (1999).

After the jury was selected, Blackwell made a *Batson* motion challenging the State's use of peremptory challenges to remove three African-American males from the jury. The jurors that were struck were Juror 45, Juror 79, and Alternate Juror 147.

The State explained that it struck: (1) Juror 45 because he "seemed very pro-life" and had a conviction for criminal domestic violence; (2) Juror 79 because "we felt that he'd be a pro-life juror" and had a criminal record; and (3) Alternate Juror 147 because he gave the impression that he would be a "pro-life juror" and he expressed that he was afraid that something would happen to his family as a result of the death penalty case.

In response, Blackwell claimed the State's reasons were pretextual and then listed five Caucasian jurors he believed were similarly situated to those struck by the State. However, on appeal, Blackwell limits his challenge to Juror 45 and Juror 79 in comparison with four Caucasian jurors: (1) Juror 70, (2) Juror 154, (3) Juror 188, and (4) Juror 266.

As noted by the State, the primary reasons for striking Juror 45 and Juror 79 were that these individuals had criminal records [14] and appeared, based on their *voir dire* responses, to be predisposed to voting for a life sentence. In contrast, of the four jurors identified by Blackwell, only Juror 70 had a criminal record as he had been convicted of criminal domestic violence. Juror 154 had no criminal record as prior charges had been dismissed, Juror 188 had minor pending charges

---

14. Juror 45 had been convicted of criminal domestic violence and Juror 79 had been convicted of possession of a firearm, shoplifting, and several drug charges.

subject to Pre-Trial Intervention, and Juror 266 had no criminal record. Thus, strictly based on this comparison, the only juror that possibly could be deemed similarly situated would have been Juror 70.

However, Juror 70 was not similarly situated to Juror 45 and Juror 79 given his *voir dire* responses revealed meaningful distinctions. *See State v. Scott*, 406 S.C. 108, 115, 749 S.E.2d 160, 164 (Ct. App. 2013) ("[I]n determining whether potential jurors are similarly situated, our courts have focused their inquiry on whether there are meaningful distinctions between the individuals compared." (citation omitted)).

During his questioning, Juror 45 expressed his disapproval of the criminal justice system and the death penalty. Notably, the State voiced concern over Juror 45's qualification even at that point. Juror 79 also gave the impression that he would not be comfortable voting for a death sentence, stating "I was just thinking about it, ... that's a lot to have on you ... dawning on you that you somewhat participated in someone's death." As the State claimed, these responses revealed Jurors 45 and 79 were inclined to vote for a sentence of life imprisonment even before hearing the evidence of the case.

In comparison, Juror 70 gave responses that appeared sentence neutral. For example, the juror talked about mercy, implying he could vote for a life sentence, but also indicated he was open to voting for a death sentence if the circumstances warranted. Therefore, while Juror 70 had a criminal record like the two African-American jurors struck by the State, he was not similarly situated to these jurors. We find Juror 70's responses distinguished him from Jurors 45 and 79, thus, negating Blackwell's claim that the State's reasons for striking these jurors were pretextual.[15] Accordingly, in view of all of

---

15. Furthermore, even if the pending charges against Juror 188 equate to a criminal record, we find she was not similarly situated to Jurors 45 and 79 as her responses during *voir dire* revealed meaningful distinctions. Specifically, Juror 188 characterized herself as the type of juror who would reach a decision as to the appropriate punishment based on the evidence of aggravating and mitigating circumstances. Although she questioned whether certain crimes warranted the death penalty, she affirmed that she would be open minded to making a decision based on all of the evidence presented.

these factors, we find the trial court correctly determined that Blackwell failed to prove a *Batson* violation.

## C. Right to Cross-Examine State Witness with Privileged Mental Health Records

During the guilt and penalty phases, Blackwell sought to impeach his ex-wife, Angela, with statements she made after the murder during counselling sessions with a licensed mental health counselor. Blackwell claimed the statements in the mental health records revealed that Angela was "biased" and "motivated to misrepresent" what actually happened at the time of the murder. The trial court denied Blackwell's request, finding Angela had not waived her statutory privilege to release the records. Based on this ruling, the court did not review the records and declined to accept them as a proffered exhibit.

On appeal, Blackwell argues the trial court denied him his constitutional right to confront and cross-examine the State's "most critical witness." Alternatively, Blackwell asserts he is entitled to a new trial because the trial court's refusal to accept the proffer of the mental health records denied him meaningful appellate review.

"The Confrontation Clause of the Sixth Amendment, extended against the States by the Fourteenth Amendment, guarantees the right of a criminal defendant 'to be confronted with the witnesses against him.' " *Richardson v. Marsh*, 481 U.S. 200, 206, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987) (quoting U.S. Const. amend. VI). This constitutional right "include[s] the right to cross-examine those witnesses." *Pointer v. Texas*, 380 U.S. 400, 401, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). "A criminal defendant may show a violation of the Confrontation Clause 'by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby to expose to the jury the facts from which jurors could appropriately draw inferences relating to the reliability of the witness.' " *State v. Mizzell*, 349 S.C. 326, 331, 563 S.E.2d 315, 317 (2002) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 680, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (internal quotation marks omitted)).

This issue presents the novel question of whether a criminal defendant's constitutional right to confront a witness trumps a witness's state constitutional right to privacy [16] and statutory privilege [17] to maintain confidential mental health records.

While South Carolina appellate courts have yet to answer this specific question,[18] the majority of jurisdictions in the United States have determined that a criminal defendant's right, provided certain requirements are met, may supersede a witness's rights or statutory privilege.[19] *See N.G. v. Superior*

16. S.C. Const. art. I, § 10 (prohibiting unreasonable invasions of privacy); *see* S.C. Const. art. I, § 24 (outlining Victims' Bill of Rights).

17. *See* S.C. Code Ann. § 19-11-95(B)(1), (C)(1),(2) (2014) (providing that a mental healthcare provider may not reveal confidential information unless the patient gives written authorization or the confidences are "allowed by statute or other law"); *id.* § 19-11-95(D)(1) (stating, in pertinent part, "[a] provider shall reveal confidences when required by statutory law or by court order for good cause shown to the extent that the patient's care and treatment or the nature and extent of his mental illness or emotional condition are reasonably at issue in a proceeding"); *id.* § 44-22-90(A)(7) (2002) (providing patient's communications with mental health professionals are privileged with limited exceptions, such as if the disclosure is "authorized or permitted to be disclosed by statute"). *See generally* 8 S.C. Jur. *Mental Health* § 39, at 152 (1991) (stating that communications between patients and mental health professionals are privileged but "exceptions are based upon a 'need-to-know,' consent, judicial necessity or an emergency situation" (footnote omitted)).

18. To a limited extent, our appellate courts have addressed the disclosure of mental health records in criminal proceedings; however, they have never directly analyzed the precise issue presented in the instant case. *See State v. Terry*, 339 S.C. 352, 529 S.E.2d 274 (2000) (affirming, in a capital case, trial judge's decision to order disclosure of mental health records pertaining to defendant's hospitalization for anger management and substance abuse given the records were relevant to the jury's assessment of defendant's character during penalty phase); *State v. Parker*, 294 S.C. 465, 366 S.E.2d 10 (1988) (concluding trial judge properly denied defense motion to offer psychiatric records of third party where evidence proffered by defendant was not inconsistent with his guilt).

19. *See N.G. v. Superior Court*, 291 P.3d 328 (Alaska Ct. App. 2012); *State v. Slimskey*, 257 Conn. 842, 779 A.2d 723 (2001); *Burns v. State*, 968 A.2d 1012 (Del. 2009); *Bobo v. State*, 256 Ga. 357, 349 S.E.2d 690 (1986); *State v. Peseti*, 101 Hawai'i 172, 65 P.3d 119 (2003); *State v. Neiderbach*, 837 N.W.2d 180 (Iowa 2013); *Commonwealth v. Barroso*, 122 S.W.3d 554 (Ky. 2003); *State v. Johnson*, 440 Md. 228, 102 A.3d

*Court*, 291 P.3d 328, 337 (Alaska Ct. App. 2012) ("This issue has, however, arisen in other jurisdictions, and a majority of those courts have concluded that, if the defendant makes a sufficient preliminary showing, the defendant is entitled to have the trial court conduct an *in camera* inspection of a government witness's mental health records—and that the witness's psychotherapist-patient privilege can be overridden if the trial court concludes that portions of those records are sufficiently relevant to the defendant's guilt or innocence, or are sufficiently relevant to the witness's credibility.").

In doing so, these jurisdictions have established some variation of a procedure by which a trial court reviews the requested records *in camera* and makes a determination of whether the defendant has established that the records are sufficiently relevant and probative. We are persuaded by the procedure enunciated by the Supreme Court of Kentucky, which provides:

If the psychotherapy records of a crucial prosecution witness contain evidence probative of the witness's ability to recall, comprehend, and accurately relate the subject matter of the testimony, the defendant's right to compulsory process must prevail over the witness's psychotherapist-patient privilege. Upon a proper preliminary showing . . . the witness's psychotherapy records are subject to production for an *in camera* inspection to determine whether the records

295 (2014); *Commonwealth v. Dwyer*, 448 Mass. 122, 859 N.E.2d 400 (2006); *People v. Stanaway*, 446 Mich. 643, 521 N.W.2d 557 (1994); *State v. Hummel*, 483 N.W.2d 68 (Minn. 1992); *State v. Duffy*, 300 Mont. 381, 6 P.3d 453 (2000); *State v. King*, 162 N.H. 629, 34 A.3d 655 (2011); *State v. L.J.P.*, 270 N.J.Super. 429, 637 A.2d 532 (1994); *State v. Ramos*, 115 N.M. 718, 858 P.2d 94 (N.M. Ct. App. 1993); *State v. Blake*, 63 P.3d 56 (Utah 2002); *State v. Green*, 253 Wis.2d 356, 646 N.W.2d 298 (2002); *Gale v. State*, 792 P.2d 570 (Wyo. 1990); *but see People v. Hammon*, 15 Cal.4th 1117, 65 Cal.Rptr.2d 1, 938 P.2d 986 (1997); *People v. Turner*, 109 P.3d 639 (Colo. 2005); *State v. Famiglietti*, 817 So.2d 901 (Fla. Dist. Ct. App. 2002); *In re Subpoena to Crisis Connection, Inc.*, 949 N.E.2d 789 (Ind. 2011); *Commonwealth v. Wilson*, 529 Pa. 268, 602 A.2d 1290 (1992). *See generally* Clifford S. Fishman, *Defense Access to a Prosecution Witness's Psychotherapy or Counseling Records*, 86 Or. L. Rev. 1 (2007) (discussing substantive and procedural implications of conflict between privileged material and constitutional rights of defendants).

contain exculpatory evidence, including evidence relevant to the witness's credibility.

*Commonwealth v. Barroso*, 122 S.W.3d 554, 563 (Ky. 2003).

In contrast to the above-outlined procedure, the trial court in the instant case summarily issued an *ex parte* order granting Blackwell pre-trial access to Angela's records. The trial court's issuance of this order was not necessarily erroneous as a court is statutorily authorized to direct the disclosure of the records. Specifically, section 44-22-100(A)(2) of the South Carolina Code provides that, in the absence of the patient's consent, mental health records must be kept confidential, and must not be disclosed *unless* "a court directs that disclosure is necessary for the conduct of proceedings before the court and that failure to make the disclosure is contrary to public interest." S.C. Code Ann. § 44-22-100(A)(2) (Supp. 2015). However, the court's authority to order disclosure is not without limitation as any disclosure is subject to the prohibitions of applicable federal law. *See id.* § 44-22-100(B)(2) ("Nothing in this section requires the release of records which disclosure is prohibited or regulated by federal law.").

Yet, while the trial court had the authority to order disclosure of Angela's records, the court ordered disclosure prematurely as it ruled the records were "necessary to the adequate preparation of the Defense" and that the defense's request was reasonable without inquiring whether Angela waived her statutory privilege or reviewing the contents of the records *in camera*. Further, aside from the initial disclosure of the records to Blackwell's counsel, the trial court again declined to review the records at trial when offered for cross-examination purposes. Instead, the court categorically foreclosed any further consideration of these records, either at trial or on appeal, based on Angela's assertion of her statutory privilege. By doing so, the trial court discounted Blackwell's right to confrontation and erroneously found that a witness's right to privacy and statutory privilege are absolute.

Given the dearth of South Carolina case law on this issue and the lack of authority presented by the parties, it is understandable how the trial court arrived at this ruling. In order to avoid similar rulings in the future, we now adopt a procedure that effectuates the legislative mandates of section

154

44-22-100 of the South Carolina Code and the constitutional protections of the Confrontation Clause.[20]

Accordingly, heretofore, trial judges, *prior to **any** disclosure of privileged mental health records*, should conduct a hearing [21] with the parties in which the judge inquires whether the witness consents to the disclosure of the privileged records. S.C. Code Ann. § 44-22-100(A)(1) (Supp. 2015). If the witness does not consent, the judge alone should review

---

**20.** Justice Few effectively deems portions of our analysis inconsequential. In doing so, he removes several analytical blocks with the expectation that the result, to which he agrees, will remain structurally sound.

In contrast to Justice Few, we believe this issue requires a sequential analysis beginning with the trial court's pre-trial ruling. Further, the compulsory process issue is necessary, in other words crucial, to our analysis. A review of the record on appeal and the parties' briefs reveals that this is the precise issue for which they sought resolution from this Court. Given the significance of this novel issue, we decline to take the myopic view as that of Justice Few. Instead, we choose to analyze the issue confronted by the trial court in a manner that not only resolves this portion of Blackwell's appeal but also provides guidance for future requests for the disclosure of a witness's confidential mental health records.

Additionally, we disagree with Justice Few's assessment of *Barroso* as we believe he overstates the import of that decision to our analysis. As stated, we cite *Barroso* as *persuasive* authority, as opposed to controlling, in an effort to explain the statutory procedure mandated by our General Assembly in section 44-22-100. Clearly, we are cognizant of the legislative mandates of section 44-22-100. Consequently, in contrast to Justice Few's characterization of our analysis, we have been careful to neither expand nor limit the statute as written.

**21.** This hearing should be conducted *only after* the party requesting the records has met the minimal threshold requirement of presenting evidence sufficient to establish a reasonable belief that the records contain exculpatory evidence, including, but not limited to, evidence relevant to the witness's credibility. *See State v. Johnson*, 440 Md. 228, 102 A.3d 295, 309 (2014) ("We recognize how unlikely it may be that a defendant or defense counsel will *know* in advance what information is in a patient's privileged mental health or psychotherapy records. Nonetheless, in order to gain access to any information in those records, the defendant may (and must) be able to point to *some fact* outside those records that makes it *reasonably likely* that the records contain exculpatory information."). We believe this preliminary showing, in contrast to a generalized assertion, is necessary to guard against a "fishing expedition" of a witness's mental health records. The mere fact that a witness has received mental health counseling is not sufficient to warrant an *in camera* hearing as there is no evidence that receipt of counseling somehow automatically makes a witness less credible.

the contents of the records to determine whether "disclosure is necessary for the conduct of proceedings before the court and that failure to make the disclosure is contrary to public interest." *Id.* § 44-22-100(A)(2). In making this determination, the judge should assess the importance of the witness to the prosecution's case and whether the records contain exculpatory evidence, including, *but not limited to,* evidence relevant to the witness's credibility.[22]

In the event the judge orders the disclosure of the records,[23] the judge still retains wide latitude to limit the use of the records at trial. *See State v. Turner,* 373 S.C. 121, 130, 644 S.E.2d 693, 698 (2007) (recognizing that trial courts "retain wide latitude, insofar as the Confrontation Clause is concerned, to impose reasonable limits on such cross-examination based on concerns about, among other things, prejudice, confusion of the issues, or interrogation that is only marginally relevant").

Here, the trial court erred in granting defense counsel access to Angela's mental health records prior to an *in*

---

22. The dissent takes issue with the procedure that we adopt because it "imposes on the trial judge an unreasonable burden." However, this "burden," as characterized by the dissent, is not only statutorily imposed by our General Assembly but generally recognized by our common law in that a trial judge is vested with the sole authority to determine the admissibility of evidence. *See, e.g.,* S.C. Code Ann. § 19-11-95(D)(1) (2014) (stating, in pertinent part, "[a] provider shall reveal confidences when required by statutory law *or by court order for good cause shown to the extent that the patient's care and treatment or the nature and extent of his mental illness or emotional condition are reasonably at issue in a proceeding"* (emphasis added)); *State v. Evins,* 373 S.C. 404, 421, 645 S.E.2d 904, 912 (2007) (recognizing that the relevance, materiality, and admissibility of evidence are matters within the sound discretion of the trial court).

23. Even though a party may seek disclosure of a witness's records in their entirety, the judge has the authority to limit the extent of disclosure. *Cf. McMakin v. Bruce Hosp. Sys.,* 318 S.C. 15, 20, 455 S.E.2d 693, 696 (1995) (analyzing procedure used by trial court for disclosure, as identified in section 44-22-100 of South Carolina Code, to determine whether it complied with state and federal law; concluding that, in patient's negligence action against drug treatment facility, identification of patients in question and not their medical records or confidential communications was "necessary to the conduct of proceedings before the court" and was in "the public interest in a judicial system functioning with full discovery powers").

*camera* review, declining to review the records at trial, and refusing to accept the proffer of the records. However, these errors do not automatically warrant reversal as "[a] violation of the Confrontation Clause is not per se reversible but is subject to a harmless error analysis." *State v. Gracely*, 399 S.C. 363, 375, 731 S.E.2d 880, 886 (2012). "Whether such an error is harmless in a particular case depends upon a host of factors." *Id.* (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)). "The factors include the *importance of the witness's testimony* in the prosecution's case, whether the testimony was *cumulative*, the presence or absence of evidence *corroborating* or contradicting the testimony of the witness on material points, the *extent of cross examination* otherwise permitted, and, of course, the *overall strength* of the prosecution's case." *Id.* (emphasis in original).[24]

In conducting this analysis, we note that this Court accepted the records under seal. Thus, any challenge to the trial court's failure to admit the proffered records for purposes of appellate review is moot. *See Curtis v. State*, 345 S.C. 557, 567, 549 S.E.2d 591, 596 (2001) (stating that a case becomes moot when judgment, if rendered, will have no practical legal effect upon the existing controversy). Moreover, having thoroughly reviewed the contents of the records, we do not believe Blackwell established the necessity of these records as they were neither material nor exculpatory, particularly since Blackwell conceded guilt.[25] We also question how this information was probative and how it would have helped Blackwell's case in mitigation.

---

**24.** Rather than conduct a harmless-error analysis, as we are permitted to do, the dissent believes "we must reverse and remand in order to permit the trial judge to exercise his discretion." Interestingly, it appears the dissent vacillates between acting as an appellate court and a trial court depending on the desired result.

**25.** Blackwell emphasizes the fact that Angela was the only eyewitness to the murder. Yet, Blackwell's claim is not entirely accurate because Blackwell's son-in-law, Mark Bryant, testified that he saw Blackwell grab Brooke and hold a gun to the child. Although Blackwell's son-in-law did not witness the shooting because he brought the other children to safety inside the home, he did testify that he heard the shots shortly after entering the home.

As we understand Blackwell's strategy, he sought to show that Angela created the "toxic" environment that precipitated the shooting and, as a result, Blackwell did not lure Angela to their daughter's home with the intention of committing the murder but, rather, "snapped" in response to "taunting" by Angela. However, there is in fact strong evidence of malice aforethought in the record given: (1) Blackwell's father testified that after Blackwell and Angela separated he took Blackwell's guns and locked them in a box because he feared what Blackwell might do; (2) Blackwell had to retrieve the gun used to shoot Brooke from his father's locked case; (3) earlier on the day of the murder Angela and Blackwell discussed that Angela would take her grandsons swimming; and (4) Blackwell was present at the daughter's home when Angela arrived to pick up her grandsons.

Further, while Angela was a key witness for the State, Blackwell's counsel was able to thoroughly cross-examine her and attack her credibility by comparing her written statement with her trial testimony. Additionally, we conclude that the targeted statements in the records were cumulative to the testimony of other witnesses at trial. Taking these factors into consideration, we find the trial court's decision not to review the records *in camera* was harmless error.

### D. Exclusion of Hospital Chaplains' Notes

During Blackwell's mitigation case, he attempted to introduce notes from two hospital chaplains who spoke with Blackwell while he was receiving medical treatment after the shooting. The notes stated that Blackwell was "struggling with guilt," was "struggling with his actions," was "sad," "had some prayers in his heart," and "asked for prayers for the family." Blackwell claimed the notes, which he attempted to introduce through a records custodian from the Spartanburg Regional Healthcare System, were being offered to rebut evidence introduced by the State indicating Blackwell's apparent lack of remorse. Specifically, Blackwell referenced the testimony of Spartanburg County Sheriff Deputy Lorin Williams, the officer who questioned him at the hospital after the shooting, stating that Blackwell told him: (1) he had "been having sour thoughts about how to get back at [Bobby Center] for break-

ing up his marriage"; and (2) "the only thing that I'm sorry about is that I didn't do a better job on myself."

The State objected on hearsay grounds, arguing the information contained in the notes was not in the nature of a medical diagnosis, the chaplains were available as witnesses, and the notes were more prejudicial than probative. The trial court granted the State's motion, finding the notes constituted inadmissible hearsay as they were not necessary to medical treatment or diagnosis [26] and were in the form of an opinion.

Blackwell contends the notes were admissible pursuant to the business records exception to the rule against hearsay. Alternatively, Blackwell asserts that, even if the evidence violated the South Carolina Rules of Evidence, it was nevertheless admissible under his Eighth Amendment right to present mitigating evidence in a capital case.

"Hearsay is a statement, which may be written, other than one made by the declarant while testifying at trial, offered in evidence to prove the truth of the matter asserted." *State v. Brockmeyer*, 406 S.C. 324, 351, 751 S.E.2d 645, 659 (2013) (quoting *In re Care & Treatment of Harvey*, 355 S.C. 53, 61, 584 S.E.2d 893, 897 (2003)); Rule 801(c), SCRE. "Hearsay is not admissible unless there is an applicable exception." *Id.*; Rule 802, SCRE.

Rule 803(6) of the South Carolina Rules of Evidence, which is identified as the business records exception, provides:

A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, or *diagnoses*, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless

---

**26.** In support of this ruling, the court cited *State v. Burroughs,* 328 S.C. 489, 492 S.E.2d 408 (Ct. App. 1997), wherein the Court of Appeals found inadmissible a sexual assault victim's statement to a treating nurse that her assailant asked for a hug before the assault. The Court of Appeals determined the statement was not "reasonably pertinent" to the victim's medical diagnosis or treatment and, thus, did not fall within the exception to the rule against hearsay found in Rule 803(4) of the South Carolina Rules of Evidence. *Id.* at 501-02, 492 S.E.2d at 414.

the source of information or the method or circumstances of preparation indicate lack of trustworthiness; <u>provided</u>, <u>however</u>, that *subjective opinions and judgments found in business records are not admissible*. The term "business" as used in this subsection includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

Rule 803(6), SCRE (first and third emphasis added); *see* S.C. Code Ann. § 19-5-510 (2014) ("A record of an act, condition or event shall, insofar as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission.").

As identified in Rule 803(6), SCRE, the term "diagnoses" is described as:

Statements made for purposes of *medical diagnosis or treatment* and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as *reasonably pertinent to diagnosis or treatment*; provided, however, that the admissibility of statements made after commencement of the litigation is left to the court's discretion.

Rule 803(4), SCRE (emphasis added).

Business records are admissible under Rule 803(6), SCRE and section 19-5-510 of the South Carolina Code:

as long[ ] as they are (1) prepared near the time of the event recorded; (2) prepared by someone with or from information transmitted by a person with knowledge; (3) prepared in the regular course of business; (4) identified by a qualified witness who can testify regarding the mode of preparation of the record; and (5) found to be trustworthy by the court.

*Ex parte Dep't of Health & Envtl. Control*, 350 S.C. 243, 249-50, 565 S.E.2d 293, 297 (2002).

Here, during the proffer to the trial court, the records custodian verified that the document containing the hospital chaplains' notes was kept in the regular course of business at

Spartanburg Regional Healthcare System and that the document was prepared near the time of the event that was recorded. Although this testimony established the foundational requirements for the admissibility of the business record,[27] we find the trial court correctly excluded the document as it contained inadmissible subjective opinions and judgments, in particular the notations that Blackwell was "struggling with guilt" and "struggling with his actions."

Nonetheless, even if the trial court erred in excluding the chaplains' notes, we find the error harmless as the evidence was cumulative to other evidence in the record of Blackwell's remorse. *See State v. Northcutt*, 372 S.C. 207, 221, 641 S.E.2d 873, 881 (2007) ("Although it was error to exclude the letter written from Appellant to Ms. Northcutt expressing remorse, the error was harmless. The record contains evidence of Appellant's remorse. Appellant was not prejudiced, nor was the outcome of the trial affected.").

Specifically, as mitigation evidence, Blackwell presented: (1) Dr. Donna Schwartz-Watts, a psychiatrist who evaluated Blackwell, who testified that "[i]t's very hard for [Blackwell] to accept what happened and what he's done," and "he's very sad about it"; (2) Heather Bryant, his daughter, who testified that "he regrets what he has done" and "suffers from that every day"; and (3) Ken Rice, his pastor, who testified that Blackwell told him "God's forgiven me but I can't forgive myself."

Finally, we disagree with Blackwell's claim that because the death penalty is involved the Eighth Amendment bestows upon a defendant the unfettered ability to introduce mitigating evidence. In support of this assertion, Blackwell relies on

---

**27.** We disagree with the State's argument that the document did not qualify as a business record because the chaplains' notes were not made for the purpose of medical diagnosis or treatment. Contrary to the State's assertion, the notes were in fact "reasonably pertinent" to Blackwell's medical treatment. The document entitled "Flow Sheet" chronicled Blackwell's healthcare between July 13, 2009 and July 15, 2009 and indicates that it is a record from Spartanburg Regional's "Interdisciplinary Plan of Care." Significantly, this document includes nurses' notes regarding Blackwell's care as well as notes for "Pastoral Assess" and "Pastoral Care."

*Green v. Georgia,* 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979) and its progeny.[28]

Blackwell's reliance on *Green* is misplaced as he overstates the import of that decision. In *Green,* the USSC found mitigating evidence that violated hearsay rules was nonetheless admissible. *Green,* 442 U.S. at 97, 99 S.Ct. 2150. However, the USSC expressly limited its decision to the specific facts of the case, which included the admission of an exculpatory confession of a third-party offered through hearsay. *Id.* ("Regardless of whether the proffered testimony comes within Georgia's hearsay rule, *under the facts of this case* its exclusion constituted a violation of the Due Process Clause of the Fourteenth Amendment." (emphasis added)). The USSC found that this mitigating evidence, despite its violation of the rules against hearsay, was reliable and highly relevant to a critical issue. *Id.* Because the holding in *Green* was limited to the specific facts of the case, we do not interpret the USSC's decision to require trial courts to disregard evidentiary rules in every instance and, in turn, admit all evidence offered in mitigation.

Moreover, the trial court's exclusion of the hospital chaplains' notes did not impermissibly exclude an entire category of mitigating evidence. Rather, the excluded evidence was cumulative to other properly admitted evidence of mitigation. *See Sheppard v. Bagley,* 657 F.3d 338, 345-46 (6th Cir. 2011) (discussing *Green, Eddings,* and *Tennard* and concluding that "these cases concerned the exclusion of an entire *category* of relevant mitigating evidence. They do not impose on state courts a constitutional imperative to admit cumulative or irrelevant evidence").[29]

---

**28.** *See Tennard v. Dretke,* 542 U.S. 274, 285, 124 S.Ct. 2562, 159 L.Ed.2d 384 (2004) (stating that once the low threshold for relevant evidence is met, "the Eighth Amendment requires that the jury be able to consider and give effect to a capital defendant's mitigating evidence" (internal quotation marks and citation omitted)); *Eddings v. Oklahoma,* 455 U.S. 104, 117, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (holding that "state courts must consider all relevant mitigating evidence and weigh it against the evidence of aggravating circumstances").

**29.** The dissent "would reverse and remand the sentence on this ground alone," apparently finding the exclusion of this evidence was the result of a "rote" application of our state's hearsay rules. While the exclusion of this evidence was based on the trial court's application of Rules 803(4) and (6), SCRE it was not rote given the trial court exercised its

### E. Evidence of Mental Retardation Presented During Penalty Phase

Blackwell raises two challenges to the jury instructions given by the trial court during the penalty phase. First, Blackwell claims the court erred in refusing to charge the jury that the State had the burden of proving beyond a reasonable doubt that Blackwell is not mentally retarded. Second, Blackwell avers the court erred in charging the jury that it was required to find by a preponderance of the evidence that Blackwell is mentally retarded. Blackwell maintains the court's charge effectively and impermissibly placed upon him the burden of proving the existence of a mitigating circumstance.

As an initial matter, we find Blackwell's first argument to be without merit. This Court has definitively held, and Blackwell readily conceded at trial, "[t]he fact a defendant is not mentally retarded is not an aggravating circumstance that increases a defendant's punishment; rather, the issue is one of eligibility for the sentence imposed by a jury." *State v. Laney*, 367 S.C. 639, 648, 627 S.E.2d 726, 731 (2006). Consequently, because the absence of mental retardation is neither an element of the offense of capital murder nor a statutory aggravating circumstance, the State has no burden of proof. *See id.* (rejecting argument that the prosecution is required to prove the absence of mental retardation in the sentencing phase of a capital murder trial).

Blackwell's second issue, however, presents more difficult questions. Specifically, we must determine, in the penalty phase, (1) the allocation of the burden of proof when a defendant claims mental retardation as an exemption from the death penalty, and (2) the applicable standard of proof for that burden.

In the instant case, the trial court held a charge conference during the penalty phase and considered Blackwell's proposed instructions and verdict form regarding a finding of mental retardation. Throughout the charge conference, Blackwell's counsel repeatedly expressed concern with any instruction

discretion as to the admissibility of the evidence. Further, "the after-the-fact evidence of remorse" referred to by the dissent is a proper consideration for harmless-error analysis.

that placed the burden of proof on the defense to prove by the preponderance of the evidence that Blackwell is mentally retarded. Counsel further appeared to advocate for a charge that the jury's decision had to be unanimous either in finding mental retardation or rejecting mental retardation.

Ultimately, the court instructed the jury that the "burden of proof is upon the State" and that the State had to prove the existence of one of the aggravating circumstances by proof beyond a reasonable doubt. With respect to mental retardation, the court noted that this was a "threshold matter" on which the defense had presented evidence. The court then instructed:

Now, in order to establish that the defendant suffered from mental retardation at the time of the crime, that fact must be found by you, the jury, by evidence that you find to be the preponderance of the evidence or the greater weight of the evidence. This is a different standard of proof th[a]n I've discussed with you in the past in this case. Normally, in a criminal proceeding, facts are to be proven beyond a reasonable doubt. That's not the standard as to this particular question or issue. The level of proof as to this question is lower than proof beyond a reasonable doubt.

Again, for a finding by you ... on this matter, the level of proof must be by the great weight or preponderance of the evidence.

As to this finding, the court instructed the jury to consider the separate verdict form, which stated:

We, the jury, unanimously find by the preponderance of the evidence that the Defendant was mentally retarded as defined as, significantly sub-average general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the developmental period at the time of the commission of the crime of murder in this case.

The form had blanks for the jury to indicate either "Yes," "No," or that they were unable to make a unanimous finding. The form instructed that: (1) if the jury answered "Yes" it was to stop its deliberations; and (2) if the jury answered "No" or was unable to make a unanimous finding it was to proceed with further deliberations. The trial court explained this verdict form and further instructed that if the jury answered

"No" or was unable to make a unanimous determination that the jury could still consider the factor of mental retardation as a mitigating factor. The court explained that:

[S]hould the jury find that the defendant was not mentally retarded or should, after a full and thorough deliberations, the jury not be able to make a unanimous finding as to this question, the factor of mental retardation can—is still a mitigating factor that the jury can consider along with other mitigating factors in this case.

With respect to mitigating factors, the court identified five statutory mitigating circumstances.[30] The court explained that, if the jury had "gotten past [the] threshold issue" of mental retardation, it could still consider evidence of mental retardation to be a mitigating factor in reaching a verdict. The court further instructed that:

While there must be some evidence which supports a finding by you that a statutory or nonstatutory mitigating circumstance exist[s], you need not find the existence of such a circumstance by proof beyond a reasonable doubt or any other level of proof. You may consider any mitigating circumstance supported by the evidence submitted to you, and you must determine whether the evidence exists and the significance to be given to that evidence.

At the conclusion of deliberations, the jury answered "No" on the separate verdict form as to a finding of mental retardation. The jury then recommended a sentence of death, determining the State proved the aggravating circumstances that the murder involved a child under the age of eleven and was committed while in the commission of kidnapping.

While we find no error in the trial court's instructions, we take this opportunity to refine the *Atkins* procedure enunciat-

---

**30.** The judge instructed the jury on the following statutory mitigating circumstances: (1) the defendant had no significant history of prior criminal conviction involving the use of violence against another person; (2) the murder was committed while the defendant was under the influence of mental or emotional disturbance; (3) the capacity of the defendant to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was substantially impaired; (4) the age or mentality of the defendant at the time of the crime; and (5) the defendant had mental retardation at the time of the crime. S.C. Code Ann. § 16-3-20(C)(b)(1), (2), (6), (7), (10) (2015).

ed in *Franklin v. Maynard*, 356 S.C. 276, 588 S.E.2d 604 (2003), particularly the allocation of the burden of proof and appropriate standard of proof in presenting a claim of mental retardation during the penalty phase of a capital trial.

 As established in *Franklin*, the defendant, in the pretrial *Atkins* proceeding, has the burden of proving he or she is mentally retarded by a preponderance of the evidence. *Franklin*, 356 S.C. at 279, 588 S.E.2d at 606. The rationale for the defendant bearing this burden is that a finding of mental retardation constitutes an absolute bar to the imposition of the death penalty and, thus, is an affirmative defense. *See Winston v. Commonwealth*, 268 Va. 564, 604 S.E.2d 21, 50 (2004) ("In the context of capital crimes, the issue of retardation is not an element of the offense; rather, it is an affirmative defense to the imposition of the death penalty.").

Therefore, as with most affirmative defenses in this state save for self-defense,[31] we discern no reason to depart from placing the burden on the defendant to prove, in capital-sentencing proceedings, that he or she is mentally retarded by a preponderance of the evidence. *See State v. Attardo*, 263 S.C. 546, 551, 211 S.E.2d 868, 870 (1975) ("[A]ffirmative defenses must be established by the party interposing them and by a preponderance of the evidence."); *cf.* S.C. Code Ann. § 17-24-10 (2014) (providing that the defense of insanity is an affirmative defense that must be proven by the defendant by a preponderance of the evidence).[32]

---

**31.** *See State v. Bixby*, 388 S.C. 528, 553-54, 698 S.E.2d 572, 585-86 (2010) (recognizing that self-defense consists of four elements, and when a defendant raises that defense, the State bears the burden of disproving at least one of the elements beyond a reasonable doubt).

**32.** We note the statutorily or judicially adopted procedures implementing *Atkins* vary by state; however, the majority of state jurisdictions allocate the burden of proof to the defendant and assign a preponderance of the evidence standard of proof to this burden. *See Bowling v. Commonwealth*, 163 S.W.3d 361, 382 (Ky. 2005) (discussing state approaches to providing mental retardation exemption from death penalty; recognizing that nearly every court that has addressed this issue places the burden on the defendant to prove that he is mentally retarded and noting that sixteen state statutes require proof by a preponderance of the evidence and "[a]ll courts that have considered this issue in the absence of a statute have held that the defendant is required to prove entitlement to the *Atkins* exemption by a preponder-

Even though this procedure may be perceived as affording a defendant the opportunity to re-litigate the denial of a pretrial *Atkins* determination, we believe the pre-trial and penalty phase presentations effectuate the procedure identified in *Franklin*. In the pre-trial determination, the trial judge decides whether the case will proceed as a capital trial. At that early stage, the evidence may be limited and, thus, lends itself to simply a threshold determination of whether the defendant is eligible for the death penalty. If the trial judge finds the defendant has met his or her burden of proving mental retardation, then a lengthy, expensive capital trial will be avoided. However, if the case proceeds as a capital trial, the jury will have before it more information about the defendant. As a result, the jury will be able to thoroughly assess whether the defendant is mentally retarded and exempt from the death penalty. Given the gravity of a capital sentence, we believe the presentation to the jury operates as an additional safeguard against the risk of executing an individual who is mentally retarded.

Yet, as demonstrated by the facts of this case, the question remains how the jury should review evidence of mental retardation in the event it finds the defendant is not mentally retarded. While such a finding eliminates the absolute bar on the imposition of the death penalty under *Atkins*, it does not negate the existence of evidence that may establish a mitigating circumstance as provided by our General Assembly. *See State v. Laney*, 367 S.C. 639, 649, 627 S.E.2d 726, 732 (2006) ("In *Atkins*, the Supreme Court determined that mental retardation should be considered apart from mitigating circumstances."). Because there are different levels of intellectual functioning, not all of which meet the diagnostic criteria for

ance of the evidence"). *See generally* Nava Feldman, Annotation, *Application of Constitutional Rule of Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed. 2d 335 (2002), that Execution of Mentally Retarded Persons Constitutes "Cruel and Unusual Punishment" in Violation of Eighth Amendment,* 122 A.L.R.5th 145 (2004 & Supp. 2016) (identifying standard and burden of proof for *Atkins* determination in state and federal jurisdictions), *superseded in part by,* George L. Blum, Annotation, *Adequacy Under Strickland Standard of Defense Counsel's Representation of Client in Sentencing Phase of State Court Death Penalty Case—Investigation of, and Presentation of Evidence Regarding Client's Low Intelligence or Mental Retardation,* 5 A.L.R.7th Art. 6 (2015).

mental retardation to satisfy the *Atkins'* prohibition,[33] we find the evidence should be considered to determine the existence of statutory mitigating circumstances, in particular those involving the mental health and mentality of the defendant at the time of the crime. *See* S.C. Code Ann. § 16-3-20(C)(b)(2), (6), (7) (2015); *Laney,* 367 S.C. at 651, 627 S.E.2d at 732-33 (Pleicones, J., concurring) (distinguishing between capital jury's determination of mental retardation under *Atkins* and consideration of the defendant's mental health as a mitigating circumstance).

Thus, unlike the preponderance of the evidence burden required for the *Atkins'* exemption, the capital defendant bears no burden of proof with regard to this evidence of mitigation. *See State v. Hicks,* 330 S.C. 207, 218, 499 S.E.2d 209, 215 (1998) ("There is no burden of proof on a capital defendant with regard to evidence of mitigating circumstances."); *State v. Bell,* 293 S.C. 391, 405, 360 S.E.2d 706, 713 (1987) ("There is no burden of proof on a capital defendant with regard to evidence of mitigating circumstances. Rather, the jury is to consider the evidence presented and determine whether the mitigating factors exist and, if so, the significance to be accorded them.").

 Here, we find the trial court correctly instructed the jury and, thus, expressly adopt this procedure. Specifically, when a capital defendant raises an *Atkins* claim during the penalty phase, the trial judge should instruct the jury that: (1) the defendant has the burden of proving he or she is mentally retarded by the preponderance of the evidence; (2) a determination that the defendant is mentally retarded eliminates further deliberation regarding the imposition of the death penalty; (3) a finding that the defendant is not mentally retarded permits the jury to consider evidence of mental retardation in order to determine the existence of other statutory mitigating circumstances, in particular those involving the mental health and mentality of the defendant at the time of the crime; and (4) it should determine the existence of

---

**33.** *See Atkins,* 536 U.S. at 317, 122 S.Ct. 2242 ("Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus.").

evidence of a mitigating circumstance without concern for a standard of proof. We find this procedure harmonizes the mandates of the USSC in *Atkins* with the capital-sentencing procedures identified by our General Assembly.[34]

### F. Proportionality Review

Finally, we have conducted the requisite proportionality review pursuant to section 16-3-25 of the South Carolina Code. S.C. Code Ann. § 16-3-25(C) (2015); *see State v. Wise*, 359 S.C. 14, 28, 596 S.E.2d 475, 482 (2004) ("The United States Constitution prohibits the imposition of the death penalty when it is either excessive or disproportionate in light of the crime and the defendant."). In conducting this review, we searched for similar cases in which the sentence of death has been upheld. *See* S.C. Code Ann. § 16-3-25(E) (2015) (providing that in conducting a sentence review the Supreme Court "shall include in its decision a reference to those similar cases which it took into consideration").

After reviewing the entire record, we conclude the sentence of death was not the result of passion, prejudice, or any other arbitrary factor, and the jury's finding of two statutory aggravating circumstances for the murder is supported by the evidence. Furthermore, a review of prior cases establishes that the death sentence in this case is proportionate to that in similar cases and is neither excessive nor disproportionate to the crime. *See State v. Downs*, 361 S.C. 141, 604 S.E.2d 377 (2004) (concluding death sentence was warranted where defendant was convicted of murder, kidnapping, and first-degree criminal sexual conduct with a minor); *State v. Rogers*, 338 S.C. 435, 527 S.E.2d 101 (2000) (affirming sentence of death for defendant convicted of murdering a nine-year-old child).

## IV. Conclusion

Based on the foregoing, we affirm Blackwell's convictions and sentence of death.

**AFFIRMED.**

---

**34.** The dissent would adopt a procedure statutorily created in North Carolina. Unlike the dissent, we decline to look outside of our jurisdiction as we need only to refine the procedure established by this Court and our General Assembly.

KITTREDGE and HEARN, JJ., concur. FEW, J., concurring in a separate opinion. Acting Justice Costa M. Pleicones, dissenting in a separate opinion.

JUSTICE FEW:

I concur with the majority opinion except for subsection III.C. I would analyze the issues addressed in that subsection differently, but reach the same result—affirm.

First, the majority finds error in the trial court's pretrial ruling requiring disclosure of Angela's records to Blackwell's counsel. I do not believe we should address this point because Angela has not appealed the ruling and Blackwell was not aggrieved by it. *See* Rule 201(b), SCACR ("Only a party aggrieved by an order, judgment, sentence or decision may appeal."). Blackwell actually benefitted from the ruling because it allowed his counsel access to Angela's records.

Second, because Blackwell had the records and had ample time to review them prior to trial, it is not necessary for us to address compulsory process issues in order to reach a decision in this case. Therefore, it is not appropriate in this case for us to delineate a procedure trial courts must follow to resolve future requests for disclosure of records under subsection 44-22-100(A)(2) of the South Carolina Code (Supp. 2016). In any event, subsection 44-22-100(A) itself contains a procedure for compulsory process. It provides that the records to which it applies "must be kept confidential, and must not be disclosed unless ... (2) a court directs that disclosure is necessary for the conduct of proceedings before the court and that failure to make the disclosure is contrary to public interest." This subsection already requires the court to balance the privilege and a patient's right to privacy against the rights of a litigant and the public interest. In future cases, our courts will address issues that require us to further define how that balance should be struck, but because the records were disclosed to Blackwell, it is not necessary to do so in this case.

I am particularly concerned about the majority's reliance on *Commonwealth v. Barroso*, 122 S.W.3d 554 (Ky. 2003). In *Barroso*, the Supreme Court of Kentucky considered an appeal from a trial court's factual ruling that "the records contained no exculpatory evidence or information otherwise

pertinent to J.H.'s credibility as a witness." 122 S.W.3d at 557. The *Barroso* court "reviewed the records and determined that the trial judge correctly determined that they contain no exculpatory information." 122 S.W.3d at 564. Thus, the *Barroso* court's analysis regarding compulsory process procedures was not necessary to its decision and is not authoritative even under Kentucky law. *See Cawood v. Hensley*, 247 S.W.2d 27, 29 (Ky. 1952) ("A statement in an opinion not necessary to the decision of the case is obiter dictum. It is not authoritative. . . .").

In addition, the *Barroso* court analyzed a rule of evidence that is materially different from the South Carolina statute applicable in this case. The court explained that Kentucky Rule of Evidence 507(b) [35] sets forth a psychotherapist-patient privilege against disclosure of confidential communications, but includes only three exceptions, "none of which applies" when a court is asked to require disclosure for purposes of impeaching a state's witness in a criminal trial. 122 S.W.3d at 557-58. The court summarized, "Other than the three specified exceptions, . . . the psychotherapist-patient privilege is an 'absolute' privilege, *i.e.*, one that is not subject to avoidance because of a 'need' for the evidence." 122 S.W.3d at 558.

In this context of two significant distinctions between *Barroso* and this case, we confront the word "crucial." While I do not know what the Supreme Court of Kentucky intended by limiting disclosure of privileged communications to "a crucial prosecution witness," I do not believe the limitation is consistent with the standard our Legislature set in subsection 44-22-100(A)(2)—"necessary" and in the "public interest."

I do agree with the majority that the trial court erred in refusing to consider whether to admit the records into evidence on Blackwell's cross-examination of Angela. While I have doubts as to whether this refusal violated the confrontation clause, *see Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674, 683 (1986) (finding a confrontation clause violation when "the trial court prohibited *all* inquiry into the possibility that Fleetwood would be bi-

---

**35.** The Kentucky Rules of Evidence were enacted as statutes by the Kentucky General Assembly. *See* 1990 Ky. Acts ch. 88; 1992 Ky. Acts ch. 324.

ased" (emphasis in original)), I have no doubt the trial court erred by refusing to consider admitting the evidence under state evidence law, *see* Rule 608(c), SCRE ("Bias, prejudice or any motive to misrepresent may be shown to impeach the witness. . . ."); *State v. Jones*, 343 S.C. 562, 570, 541 S.E.2d 813, 817 (2001) (stating "generally, 'anything having a legitimate tendency to throw light on the accuracy, truthfulness, and sincerity of a witness may be shown and considered in determining the credit to be accorded his testimony' ").

I also agree with the majority's harmless error analysis.

ACTING JUSTICE PLEICONES:

I respectfully dissent. As explained below, I would find that Blackwell is mentally retarded [36] and ineligible for the death penalty. Moreover, I would find the trial court's error of law in refusing to consider whether Angela could be cross-examined based upon her mental health records requires a new trial on the issue of guilt. If there is to be a resentencing proceeding, then I would require the intellectual disability issue be (re) determined by the jury prior to hearing the aggravation/mitigation evidence. Should the jury determine he remains eligible, I would find the chaplains' notes should have been admitted, and would permit the trial judge to rule on the use of mental health records at this stage of the proceedings.

## A. Pre-trial *Atkins* [37] Determination

I agree with the majority that there is evidence in the record to support the trial judge's conclusion, but find his decision is against the preponderance of the evidence. I would hold that Blackwell is ineligible for a death sentence because he is mentally retarded within the meaning of S.C. Code Ann. § 16-3-20(C)(b)(10) (2016), and would therefore vacate his death sentence.

---

**36.** As the applicable statute employs this term, I use it here as well. *Cf., State v. Stanko*, 402 S.C. 252, 741 S.E.2d 708 (2013) (finding the applicable definition is that in S.C. Code Ann. § 44-20-30 (Supp. 2015), which uses the term "intellectual disability," defined identically to "mental retardation" in death penalty statute).

**37.** *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

At the pre-trial *Atkins* hearing, Blackwell had the burden of proving by a preponderance of the evidence that he was mentally retarded, that is, that he had "significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the developmental period." § 16-3-20(C)(b)(10); *Franklin v. Maynard*, 356 S.C. 276, 588 S.E.2d 604 (2003). I agree with the majority that we should review the trial judge's pre-trial *Atkins* determination using the same standard we employ when reviewing a trial court's competency decision, that is, we should affirm that decision if it is "supported by the evidence and not against its preponderance." *State v. Weik*, 356 S.C. 76, 81, 587 S.E.2d 683, 685 (2002) (internal citation omitted). In other words, our scope of review allows us to consider the weight of the evidence, as well as its existence. *Id.*; *see also State v. Nance*, 320 S.C. 501, 506, 466 S.E.2d 349, 352 (1996) (subsequent history omitted) (reviewing evidence of competency and indicating agreement with one doctor's view).

Our statute requires that the defendant claiming to be ineligible for execution establish (1) significantly subaverage general intelligence and (2) defects in adaptive behavior such as communication, self-care, and self-direction that (3) manifest themselves during the developmental period, i.e., before the age of 18. *State v. Stanko, supra*. This case points out the special difficulties in making such a showing when the defendant committed the predicate offense at the age of 50,[38] was first evaluated for mental retardation at age 53 [39]/55,[40] and whose alleged intellectual disability places him in the mildly disabled range. In my view, we must keep in mind, as the State's expert Dr. Brown recognized, "The absence of records indicating a diagnosis of intellectual disability prior to the age of eighteen cannot suffice to rule out such a diagnosis."

In my opinion, the absence of contemporaneous I.Q. records from Blackwell's youth led one of the State's experts and the trial judge to rely on unreliable school records. Further, the

---

**38.** Blackwell's date of birth is November 18, 1958, and the offense was committed in July 2009.

**39.** Dr. Calloway's evaluation.

**40.** Dr. Brown's evaluation.

dearth of information related to Blackwell's early adaptive behavior led the experts and the trial judge to rely on Blackwell's adult behavior, in violation of the statutory mandate that requires that the relevant period is the "developmental period." While I agree that a focus on the defendant's general intellectual functioning and adaptive behavior at the time he commits the offense more perfectly meets the Eighth Amendment concerns that underlie the *Atkins* bar,[41] our statute mandates that the decision whether the defendant is mentally retarded and therefore ineligible for execution be based upon the defendant's pre-majority status. *State v. Stanko, supra; compare Hall, supra* at 2001, remanding to allow the defendant to present evidence of "defects in adaptive functioning over his lifetime" as permitted under Florida law.[42] As required by statute, I have focused my review on the scant evidence of Blackwell's adaptive behavior before the age of 18 and upon the opinion of the expert I find most credible, Dr. Calloway, who testified on behalf of Blackwell.

Before reviewing the evidence, I explain why I discount the testimony of the State's experts. Blackwell relied upon the testimony of Dr. Calloway, a psychologist who was qualified as an expert in mental retardation/intellectual disability assessment, and who conducted an *Atkins* exam. The State presented testimony from two experts, Dr. Brown and Dr. Harrison. Dr. Brown, who conducted an *Atkins* evaluation, was qualified as an expert in the field of clinical forensic psychology, and had, while primarily employed by the Department of Disabilities and Special Needs, conducted five *Atkins* evaluations. The State's other expert witness, Dr. Harrison, also an expert in clinical forensic psychology, did not conduct an *Atkins* evaluation but instead examined Blackwell for competency pursuant to a court order.

---

41. Those concerns are that intellectually disabled persons, while frequently aware of the difference between right and wrong and competent to stand trial are, nonetheless, "likely unable to make the calculated judgments that are the premise for the deterrence rationale," that their intellectual disability "lessens moral culpability and hence the retributive value of the punishment;" and the concern for "the integrity of the trial process." *Hall v. Florida*, 134 S.Ct. 1986, 1993 (2014).

42. *See, e.g., Jones v. State*, 966 So.3d 319 (Fla. 2002).

While the trial judge discounted Dr. Calloway's testimony in part because she "was required to issue a supplemental report to correct glaring errors in her initial report," I am much more concerned by Dr. Brown's reliance on Dr. Harrison's demonstrably flawed conclusion. I accord little, if any, weight to Dr. Harrison's opinion on the *Atkins* issue, especially since she was not asked to make such a finding, and conducted no investigation. Instead, Dr. Harrison testified that she determined during the course of her assessment of Blackwell's competence to stand trial, including an hour and twenty-minute interview which she testified "was solely focused on his competency to stand trial," that there was not "enough indication that would suggest referring the case to the DDSN" for an *Atkins* evaluation. Dr. Brown, the State's *Atkins* expert, testified that while in Dr. Harrison's report she "points out that there may be a strong possibility of mental retardation" she ultimately determined that Blackwell did not meet the criteria. My confidence in Dr. Brown's analysis and *Atkins* opinion is seriously weakened by his admission that he gave "a great deal of significance" to Dr. Harrison's opinion. As noted above, Dr. Harrison was not tasked with making a mental retardation assessment, and admittedly conducted no testing to arrive at her conclusion but rather relied upon what she perceived to be valid school I.Q. scores, and her competency interaction with Blackwell. However, both of the *Atkins* examiners, Dr. Brown and Dr. Calloway, testified that these school I.Q. scores were not reliable in that they were not true I.Q. tests but rather scores "derived" from other generalized testing. For these reasons, I find Dr. Harrison's opinion that Blackwell is not mentally retarded to be of no value, and Dr. Brown's *Atkins* conclusion to be substantially weakened by his admission that he was strongly influenced by that opinion.

Turning to the first mental retardation consideration, general subaverage intellectual functioning, defense expert Dr. Calloway testified, and the State's expert Dr. Brown agreed, that their I.Q. testing of Blackwell conducted in his mid-50s revealed he was mildly retarded.[43] While Dr. Brown speculated that perhaps Blackwell's chemotherapy, a four-wheeler acci-

---

**43.** Dr. Calloway obtained a score of 63 or 65 and Dr. Brown of 68. Dr. Brown agreed Blackwell's score "clearly puts" him in the mentally · retarded range.

dent, and alcohol and drug use after the age of 18 may have affected his I.Q. score, he agreed there was "absolutely no evidence of that." Despite Dr. Brown's candid testimony that there was no evidence that any of these post-developmental period events had impacted Blackwell's I.Q., the trial judge found Blackwell's current low I.Q. scores "carry with them the possibility that they may have been adversely affected by events occurring in his adult life."

The trial judge found "the most reliable measures of Blackwell's I.Q. prior to age 18" are found in school "I.Q." scores and held he could not rule out the possibility that Blackwell's I.Q. had deteriorated during his adult years, concluding Blackwell had not met his burden of proving that he had "general subaverage intellectual functioning that manifested itself during the developmental period." I disagree. I would find the weight of the evidence preponderates in favor of a finding that Blackwell exhibited "significantly subaverage general intellectual functioning ... during the developmental period" within the meaning of § 16-3-20(C)(b)(10). In making this finding, I rely not only on the *Atkins* experts' opinions but also on Blackwell's academic performance, which is probative of both his general intellectual functioning and his adaptive behavior.

The question whether the evidence preponderates in favor of a finding that Blackwell had deficits in adaptive behavior before the age of 18 is closer, in large part because it requires hindsight and necessarily relies on the memories and recollections of persons who knew Blackwell more than 35 years ago. Before looking at the evidence here, I note that in *Stanko* we spoke of adaptive behavior as evidenced by significant limitations in skills such as communication, self-care, and self-direction, citing *Atkins*. *State v. Stanko*, 402 S.C. at 286, 741 S.E.2d at 726. As I read the United States Supreme Court's more recent discussion of adaptive behavior in *Hall v. Florida*, we should also look broadly at the individual's ability to learn basic skills and to adjust his behavior to changing circumstances.

Here, the school records demonstrate that in elementary school standardized achievement testing Blackwell received only a single score which placed him above the 50% average score. By high school, Blackwell was placed in classes for

children who were achieving at a lower level. These "adjunct classes" were offered in lieu of special education classes, and, as in those classes, the course work was geared to the individual's ability. The classes were not on the regular academic track but were more of a vocational nature. Despite being placed in these adjunct classes, Blackwell failed the ninth grade, and then dropped out during the 11th grade at which point his class standing was 113th in a class of 113.[44] A high school teacher reported he was not a troublemaker, blended in, and would speak if spoken to.

A number of individuals were administered the Adaptive Behavior System (ABAS-II) scale by Dr. Calloway. While the State's *Atkins* expert Dr. Brown discounted the usefulness of ABAS testing, he acknowledged it was "the best that we have" especially to measure the *Stanko/Atkins* adaptive behavior factors. Four of these individuals, Blackwell's parents, a teacher (Scruggs), and a neighbor (White), knew Blackwell as a child. The average of these four individuals' scores on "Communication" was 4, which is considered a significantly low score (the average score is 10). On the "Self-Care" scale, the average of these four individuals was 6, while on the self-direction scale (only three persons participating), the average score was 5.3, again well below average. Dr. Calloway, the defense expert, found the ABAS-II results, other records, and additional information, demonstrated that Blackwell had adaptive behavior deficits which manifested themselves before the age of 18. Dr. Brown, the State's expert, merely opined that while Blackwell arguably demonstrates significant adaptive deficits at age 55, it is "not clear" whether he met the criteria before age 18. Dr. Brown also testified he was troubled by the use of ABAS-II to relate back to Blackwell's functioning before the age of 18, and that he relied instead on Blackwell's vocational history after the age of 18, his ability as an adult to obtain a Commercial Driver's license, and the fact that Blackwell was "on track" to graduate when he dropped out of high school. In my opinion, while imperfect, the ABAS-II relates to Blackwell's developmental period which is the appropriate evaluation period.

---

44. The trial judge was impressed by Blackwell's grade of "90" for the first semester of "Family Living." I am not so very impressed given in another adjunct class he was given credit for mowing the athletic fields.

To the extent he relied on post-18 conduct, Dr. Brown's opinion is flawed, leaving standing only his opinion that it is "not clear" whether Blackwell's pre-18 adaptive behavior was deficient. Finally, as the United States Supreme Court instructed in *Hall v. Florida*, I look at the test results of basic academic skills administered to Blackwell at age 17. The results indicate he was reading at a grade level of 5.8, while his arithmetic scores tested at grade level 5.6. In my opinion, Blackwell met his burden of showing his deficits in adaptive behavior during the developmental period.

The trial judge, however, found no evidence that Blackwell was "unable to function at his home before his eighteenth birthday," that he attended school regularly and did not fail a grade until high school, and that he was able to earn high school credits before dropping out. In my opinion, these findings are supported by the record but do not properly focus on specific conduct which demonstrates adaptive behavior. Further, while the trial court found Blackwell's achievement scores at the age of 18, which show him functioning like an average mid-year fifth grader, was evidence of "average general intellectual functioning," I find them consistent with mild mental retardation. Finally, the trial court relied upon Blackwell's post-majority employment history and his twenty-six year marriage, which included raising two children, to conclude that while there were factors which raised the possibility of mental retardation, Blackwell did not meet his burden of proof. In my opinion, it is improper to use post-developmental adaptive behavior to determine statutory mental retardation. In addition, I note these broad outlines of Blackwell's post-18 life ignore the details which demonstrate Blackwell's significant limitations, such as an inability to manage a household and live alone, to pay bills, etc. This "broad view" error is also reflected in the trial judge's finding that Blackwell was "on track to graduate" when he left high school in 11th grade, which does not focus on Blackwell's largely marginal functioning in adjunct classes.[45]

---

45. I fear that the trial judge's reliance on Blackwell's "perceived adaptive strengths" will be found to have unconstitutionally skewed his view of the evidence since, as the United States Supreme Court recently explained, "the medical community focuses the adaptive-functioning

As explained above, while there is evidence that would support the trial judge's decision, I find Dr. Calloway to be the most credible *Atkins* examiner, and I find that her opinion and the other evidence in the record preponderates in favor of a finding that Blackwell is mildly mentally retarded within the meaning of § 16-3-20(C)(b)(10) and therefore ineligible for the death penalty.

## B. Cross-Examination with Privileged Mental Health Records

I agree with the majority that a criminal defendant's Sixth Amendment right to confrontation may trump a witness' state constitutional right to privacy and/or statutory privilege in her confidential mental health records. In my opinion, having decided this novel issue of law in Blackwell's favor and determined that the trial court committed an error of law in refusing to consider whether Blackwell could use these records in cross-examining or impeaching Angela during the guilt phase or in the penalty phase, we must reverse and remand in order to permit the trial judge to exercise his discretion. It is not within our appellate scope of review to make these rulings for the first time on appeal. *State v. Hewins*, 409 S.C. 93, 102-103, 760 S.E.2d 814, 819 (2014) (in criminal case appellate court reviews errors of law only; exclusion of evidence based on error of law is abuse of discretion requiring reversal). I therefore dissent from the majority's decision to supplant the trial judge's discretion and rule on a factual issue on appeal. *See State v. Hewins*, *supra* at 118-119, 760 S.E.2d at 827 (2014) (Pleicones, C.J., dissenting from majority's decision to rule on merits of a suppression motion on appeal).

In addition, I do not believe the majority proposes a workable procedure to deal with the disclosure issue going forward. By holding that the judge alone reviews the mental health records and, without benefit of input from the advocates and prior to hearing any evidence, both weighs the witness' "importance" to the case and determines whether the records contain impeaching or exculpatory evidence, the majority imposes on the trial judge an unreasonable burden. The un-

inquiry on adaptive *deficits." Moore v. Texas*, 581 U.S. ——, ——, 137 S.Ct. 1039, 197 L.Ed.2d 416 (2017) (emphasis in original).

workable nature of this procedure is demonstrated by the majority's own analysis, which relies on the record first to understand the defense's strategy and then to weigh the State's evidence of malice, before citing cumulative evidence as the reason to deny Blackwell the opportunity to have the trial judge review his request. In addition, the majority relies on Blackwell's admission that he killed the victim as admission of guilt precluding any prejudice finding, and in so doing discounts the potential relevance of the evidence in the mental health records to Blackwell's mental duress mitigation claim in the sentencing phase.

I respectfully dissent and would reverse and remand, with instructions that attorneys may have access to the mental health records prior to an *in camera* hearing on their use in the cross-examination of a witness, and that any pre-testimony ruling may be revisited during the trial, depending on the actual testimony of the witness.

## C. Chaplains' Notes

During the penalty phase, Blackwell sought to introduce the notes made by two hospital chaplains to rebut the State's evidence that immediately after the killing Blackwell exhibited no remorse. The chaplains' records were proffered by the hospital's records custodian under the "business records" exception to the hearsay rule, Rule 803(6), SCRE, and not, as the majority suggests, as "Medical Diagnosis or Treatment" statements under Rule 803(4), SCRE. To the extent the notes record Blackwell's contemporaneous expressions of remorse,[46] they cannot be, as the majority states "inadmissible subjective opinions and judgments" under Rule 803(6). Further, the refusal to admit the chaplains' contemporaneous impressions of Blackwell's regret and remorse, while perhaps subjective (even though made by professionals uniquely prepared to make exactly these types of judgments) denied Blackwell's jury the right to consider this mitigation evidence. The United States Supreme Court has repeatedly cautioned "that reliable hearsay evidence that is relevant to a capital defendant's

---

**46.** *E.g.*, that Blackwell was sad, wanted to tell his grandchildren he loved them, asked for prayers for the family, and prayed the Lord's Prayer with the chaplain.

mitigation defense should not be excluded by rote application of a state hearsay rule." *Sears v. Upton*, 561 U.S. 945, 130 S.Ct. 3259, 177 L.Ed.2d 1025 (2010) fn. 6 citing *Green v. Georgia*, 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979); and *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *cf. State v. Mercer*, 381 S.C. 149, 161, 672 S.E.2d 556, 562 (2009) (Rule 403, SCRE, "should be cautiously invoked against a capital defendant in the penalty phase, especially in light of the due process implications at stake when a capital defendant seeks to introduce mitigation evidence"). In my opinion, the trial court erred in refusing to admit these records.

Finally, I disagree that the after-the-fact evidence of remorse testified to by Blackwell's daughter and minister, as well as the testimony of Dr. Schwartz-Watts, is cumulative to Blackwell's contemporaneous expressions of remorse reflected in the chaplains' notes. I would reverse and remand the sentence on this ground alone.

## D. Mental Retardation During Penalty Phase

I agree with the majority that a capital jury must find, as a prerequisite to proceeding to decide the appropriate sentence, that the defendant is not mentally retarded. Further, I agree that where the issue of mental retardation is raised by the evidence, the burden is on the defendant to prove this disqualifying factor by a preponderance of the evidence and the jury should be so instructed. In my opinion, however, mental retardation is not an "affirmative defense" as the majority states, but rather a condition whose absence is a necessary predicate to the State's right to seek the death penalty.

I would borrow our sister state of North Carolina's statutory procedure [47] whereby if the defendant asserts intellectual disability as a disqualifying fact during the sentencing phase, all evidence relevant to that issue should be presented first, and the jury instructed on this issue alone prior to the introduction of any mitigating or aggravating evidence. If the jury determines by special interrogatory following the presentation of the evidence that the defendant is mentally retarded, then the defendant should be sentenced by the judge. In my

---

47. *See* N.C.G.S. § 15A-2005(e) (2007).

opinion, a jury that is permitted to consider the mental retardation issue in isolation, prior to the evidence of aggravation and mitigation, is more likely to be able to fairly consider the question than one whose view of the defendant has been shaped by the sentencing phase evidence that is both irrelevant and prejudicial to the claim of intellectual disability. I would reverse and remand Blackwell's sentence on this ground as well.

## E. Conclusion

In my opinion, we should set aside Blackwell's capital sentence because he proved, by a preponderance of the evidence that he is (mildly) mentally retarded within the meaning of § 16-3-20(C)(b)(10). I would reverse and remand for a new trial based upon the trial judge's error of law in refusing to consider whether Blackwell should have been permitted to utilize the witness' confidential mental health records in cross-examination. Finally, I would hold that if a new sentencing proceeding is held, the trial judge should again consider the use of the witness' records, should permit the use of the chaplains' notes, and that the two-step procedure should be used to allow the sentencing jury to decide the mental retardation issue before hearing any other evidence.