# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Bayan Aleksey, Petitioner,

v.

State of South Carolina, Respondent.

Appellate Case No. 2024-000140

---

## ON WRIT OF CERTIORARI

---

Appeal From Orangeburg County
The Honorable Edgar W. Dickson,

---

Opinion No. 28333
Heard April 1, 2026 – Filed May 20, 2026

---

## AFFIRMED

---

Allison Franz, of Columbia, for Petitioner.

Attorney General Alan McCrory Wilson, Deputy
Attorney General Donald J. Zelenka, Senior Assistant
Deputy Attorney General Melody Jane Brown, all of
Columbia, for Respondent.

---

**JUSTICE VERDIN:** We issued a writ of certiorari to review the finding by the post-conviction relief (PCR) court that Bayan Aleksey is not intellectually disabled. Aleksey was sentenced to death after a jury found him guilty of murdering a state trooper during a traffic stop. His conviction and sentence were affirmed on direct appeal, and his first application for PCR was denied. Aleksey later filed a second

PCR application, asserting he is intellectually disabled and therefore ineligible for the death penalty under *Atkins v. Virginia*, 536 U.S. 304 (2002). The PCR court conducted a hearing pursuant to *Franklin v. Maynard*, 356 S.C. 276, 588 S.E.2d 604 (2003). At that hearing, Aleksey presented five affidavits in lieu of live testimony. Among them was the affidavit of a licensed social worker (Hammock affidavit), offered as the sole expert evidence on adaptive functioning, the second prong of the intellectual disability inquiry. The PCR court excluded the Hammock affidavit, explaining it addressed a contested issue and that Hammock was unavailable for cross-examination or a credibility determination. After considering the remaining evidence, the PCR court found Aleksey failed to prove intellectual disability by a preponderance of the evidence. We affirm.

## I. Factual and Procedural Background

Aleksey shot and killed Sergeant Franklin Lingard of the South Carolina Highway Patrol during a traffic stop in 1997. A year later, a jury convicted Aleksey of murder and sentenced him to death. This Court affirmed Aleksey's conviction and sentence on direct appeal. *State v. Aleksey*, 343 S.C. 20, 538 S.E.2d 248 (2000). After the Supreme Court of the United States (Supreme Court) denied review, Aleksey filed his first PCR application in 2001, alleging ineffective assistance of counsel.

While that application was pending, the Supreme Court decided *Atkins*, holding the execution of intellectually disabled persons violates the Eighth Amendment. 536 U.S. at 321. The Supreme Court left to the states "the task of developing appropriate ways to enforce" that constitutional restriction. *Id.* at 317 (quoting *Ford v. Wainwright*, 477 U.S. 399, 416–17 (1986)). In response, this Court in *Franklin* held that death-sentenced inmates may pursue PCR relief to litigate intellectual disability claims. *Franklin*, 356 S.C. at 280, 588 S.E.2d at 606. We adopted the statutory definition of intellectual disability, "significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the developmental period," and placed the burden on the applicant to prove the condition by a preponderance of the evidence. *Id.* at 278–80, 588 S.E.2d at 605–06 (quoting S.C. Code Ann. § 16–3–20(C)(b)(10) (2003) (providing mental retardation[1] is a statutory mitigating circumstance)). If proven, the death sentence must be vacated and a life sentence imposed. *Id.* Thus, an applicant must establish

---

[1] "In 2011, the General Assembly substituted the term 'mental retardation' with 'intellectual disability.'" *Ex parte S.C. Dep't of Disabilities & Special Needs v. Linkhorn*, 420 S.C. 1, 5 n.3, 800 S.E.2d 777, 779 n.3 (2017) (citing Act No. 47, 2011 S.C. Acts 172).

three elements: (1) significantly subaverage intellectual functioning; (2) deficits in adaptive functioning; and (3) onset during the developmental period.[2]

In 2010, the PCR court denied Aleksey's first application. This Court denied certiorari in 2014, and the Supreme Court did the same the following year. Aleksey then pursued federal habeas relief. During those proceedings, new counsel identified evidence suggesting a potential intellectual disability. Aleksey filed this second PCR application in June 2015, asserting his execution is barred by *Atkins*.[3] The PCR court then ordered an intellectual disability evaluation by the South Carolina Department of Disabilities and Special Needs (SCDDSN). Dr. Alicia Hall conducted the evaluation, concluding Aleksey is not intellectually disabled. Two days before the March PCR hearing, Aleksey served notice of his intent to rely on five affidavits in lieu of live testimony.

The evidence at the PCR hearing showed Aleksey underwent seven IQ tests. Three were administered during the developmental period. At age six in 1975, he scored 96 (Test #1). In 1979, he scored 82 (Test #2). In 1983, at age fourteen, he scored 90 (Test #3). Four additional tests were administered in adulthood. In 1998, at age twenty-nine, he received a Full-Scale IQ score of 71 (Test #4), but the results were deemed invalid due to poor effort and malingering. In 2015, he scored 73 (or 72, according to Dr. Hall) (Test #5), though Dr. Hall found the result uninterpretable due to significant variability across indices. Dr. Hall instead calculated a General Ability Index (GAI)[4] score of 80. In 2018, Aleksey received a Full-Scale IQ score of 70 (Test #6), though Dr. Hall concluded his verbal IQ (VIQ) of 85 better reflected Aleksey's functioning. In 2019, Dr. David Price administered the final IQ test,

---

[2] Previously, the eighteenth birthday marked the end of the development period. *State v. Blackwell*, 420 S.C. 127, 139, 801 S.E.2d 713, 719 (2017) (analyzing the adaptive functioning prong with the standard of "significant limitations in adaptive skills such as communication, self-care, and self-direction that manifested before age eighteen" (quoting *State v. Stanko*, 402 S.C. 252, 286, 741 S.E.2d 708, 726 (2013), *overruled on other grounds by State v. Burdette*, 427 S.C. 490, 832 S.E.2d 575 (2019)). The developmental period is currently defined as "the period of time between conception and the twenty-second birthday." S.C. Code Ann. Regs. 88-510(C) (Supp. 2025). The exact age for the developmental period is not dispositive here.

[3] Aleksey moved to stay the federal habeas proceeding, which was granted on August 19, 2015, pending this Court's findings.

[4] Dr. Hall testified this is the proper clinical step when faced with the variability of results.

producing a Full-Scale IQ of 74 (Test #7). Dr. Price also conducted malingering testing and found the IQ results valid.[5]

During the hearing, Dr. Hall opined Aleksey is not intellectually disabled. She explained she administered her own testing, interviewed Aleksey, and reviewed extensive records, including affidavits, psychological reports, and school records.[6] Relying on the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition (DSM-5), she defined significantly subaverage intellectual functioning as deficits in reasoning, problem-solving, judgment, and related abilities, generally reflected by an IQ of about 70 or below. She concluded Aleksey's functioning fell in the "low average range" and did not satisfy the first intellectual disability prong. She emphasized his developmental-period scores—96, 82, and 90 (Tests #1–3)—were well above the intellectual disability range. Although later scores were lower (Tests #4–7), Dr. Hall attributed them to poor effort and malingering. She noted the examiner for Test #4 concluded Aleksey was malingering, and that Test #5 showed multiple indicators of poor effort. Regarding her own testing, Test #6, Dr. Hall reported "it was clear he was not putting forth his best effort."

Dr. Hall also concluded Aleksey did not exhibit significant deficits in adaptive functioning. Using the DSM-5 definition—"deficits in adaptive functioning that result in failure to meet developmental and sociocultural standards for personal independence and social responsibility"—she assessed how effectively Aleksey met ordinary life demands. During her interview with Aleksey, Aleksey reported he "hustled to make ends meet," held various blue-collar jobs, and managed his share of rent and utility payments. Aleksey paid bills independently using money orders and accurately described how to obtain and use them. Further, Aleksey stated he

---

[5] Dr. Hall applied the Flynn effect to six of the IQ tests. The Flynn effect adjusts for the rise in scores after publication of the testing. It is calculated by taking the years from publication to testing, multiplying this number by .33, and subtracting the number from the obtained IQ score. The IQ test results with the adjusted score were as follows: Test #1: 87.75, Test #2: 80.35, Test #3: 87.03, Test #4: Inappropriate to use score to make Flynn effect adjustment because results were deemed an underestimate, Test #5: GAI Flynn adjustment of 77.69, and Test #6: VIQ Flynn adjustment of 80.71. However, the application of the Flynn effect is not dispositive here.

[6] Dr. Hall reviewed the Hammock affidavit after her report was written and said that although she could have amended her report, she did not want to do so. Dr. Hall did not review Dr. Price's report and IQ Test (#7), because it was conducted after her report was finalized.

maintained his residence by cleaning, cooking, and doing laundry. Although he sometimes needed initial instruction, he could perform tasks independently once shown.

Turning to his developmental history, Dr. Hall acknowledged deficits in social and executive functioning, including organization, emotional regulation, and impulse control. She attributed these difficulties to ADHD and emotional disturbance diagnoses Aleksey received as a teenager. Dr. Hall emphasized his placement in special education classes was consistent with his ADHD and emotional disability diagnoses. She also noted his exposure to domestic violence and emotional abuse. In her view, Aleksey's academic struggles and behavioral issues stemmed from these factors, along with poor attendance, rather than intellectual disability.

Dr. Hall also reviewed records from the South Carolina Department of Corrections (SCDC), which included numerous written requests by Aleksey concerning his case and life in SCDC. Dr. Hall found these communications were generally well organized, with appropriate structure and minimal errors. They demonstrated Aleksey's ability to navigate institutional systems, articulate requests, and engage in problem-solving. In Dr. Hall's opinion, these abilities were inconsistent with significant adaptive deficits.

Finally, Dr. Hall concluded Aleksey did not meet the third prong of intellectual disability, onset in the developmental period. Dr. Hall testified that although Aleksey exhibited developmental delays and was evaluated multiple times as a child, no provider diagnosed or even suspected intellectual disability. Instead, Aleksey was diagnosed with other conditions, including ADHD and learning disabilities.

Dr. Price testified regarding intellectual functioning. Dr. Price administered Test #7, yielding a score of 74, and found no evidence of malingering. Dr. Price explained this score corresponded to a mental age of approximately eleven years and eight months. However, Dr. Price acknowledged that a diagnosis of intellectual disability requires assessment of both intellectual and adaptive functioning, and he evaluated only the former.

Aleksey submitted several affidavits. His mother, Vera Aleksey (Mother), asserted Aleksey had delayed speech, limited vocabulary, and difficulty forming relationships. She described Aleksey as fearful, socially isolated, and emphasized his placement in special education classes. Mother also detailed Aleksey's father's abuse and Aleksey's struggles with employment and independent living.

Lester David Rosengard, a licensed clinical social worker who treated Aleksey as a teenager, described Aleksey as sensitive, gullible, and lacking judgment. Rosengard reported Aleksey struggled to understand rules, depended heavily on his mother, and exhibited impulsive and emotionally unstable behavior. Rosengard recommended residential treatment, which Aleksey's mother declined.

Allison Franz, who argued this case with Aleksey and opposing counsel's consent, testified that when she was a second-year law student at Cornell participating in the Cornell capital punishment clinic, she conducted a readability analysis of Aleksey's correspondence to the SCDC staff from 2012. Franz stated that the analysis suggested Aleksey had a fifth-grade reading level. On cross-examination, however, Franz acknowledged the analysis measured readability, not writing ability.

Aleksey also proffered the affidavit of Marjorie Hammock, a licensed social worker with decades of experience. At the time of the hearing, Hammock was eighty-six years old and unavailable to testify; she has since passed away.[7] Hammock's affidavit addressed adaptive functioning and concluded Aleksey had significant deficits across conceptual, social, and practical domains.

In the conceptual domain, Hammock found limitations in Aleksey's communication, self-direction, and functional academics. Hammock reported Aleksey's speech development was delayed, and his vocabulary remained limited as he aged, reflecting a restricted command of language. She also concluded Aleksey lacked the ability to function independently at an age-appropriate level, relying heavily on his mother for guidance and decision making. As to academics, Hammock detailed a consistent pattern of poor performance: Aleksey was referred for psychological evaluation at age six due to delayed speech and low verbal performance; his standardized test scores placed him in the bottom four percent nationally in third grade; he failed most of his fourth and fifth grade classes; and he was placed in special education by sixth grade. By eighth grade, his abilities were assessed at approximately a fifth-grade level and he ultimately dropped out in ninth grade. Based on this history, Hammock concluded Aleksey's functional academic skills were insufficient for independent living, including tasks such as completing a job application or managing a bank account.

In the social domain, Hammock described a persistent pattern of isolation, immaturity, and impaired interpersonal functioning. She found Aleksey was quiet, withdrawn, and heavily dependent on his mother, with limited ability to relate to

[7] She died March 2, 2024.

peers. He was bullied due to his placement in special education and, in turn, avoided social interaction out of fear and embarrassment. Hammock emphasized his emotional instability, noting he was eager for acceptance yet easily manipulated by others. She characterized Aleksey as naïve and gullible, often unable to appreciate the consequences or risks of his actions. Aleksey's leisure activities reflected similar limitations—he did not participate in sports, struggled to understand rules or structured play, and was unable to complete even simple recreational tasks, such as building models or playing board games.

In the practical domain, Hammock identified deficits in self-care, independent living, community use, and employment. She reported Aleksey exhibited delayed development in basic self-care, including prolonged bedwetting and reliance on his mother for routine tasks. As an adult, Aleksey never lived independently, struggled to maintain a household, and was unable to prepare meals or manage daily responsibilities without assistance. Although he could occasionally shop for groceries, Hammock found he was unable to manage money effectively, plan expenditures, or maintain financial independence. Hammock also concluded Aleksey lacked the capacity to sustain employment, noting he required supervision in early jobs and was terminated for poor performance and misunderstandings about basic responsibilities, including handling money. Hammock further cited concerns over his health and safety, including difficulty managing medication and a history of suicidal behavior during adolescence. Taken together, Hammock concluded these deficits rendered Aleksey unable to function independently in daily life.

The State objected only to the Hammock affidavit. After the hearing, the PCR court postponed ruling on the admission of the affidavit, allowing time for the State to contact Hammock for cross-examination or to identify its own rebuttal witness. The record, however, reflects no further action by the State.

In its order denying relief, the PCR court excluded the Hammock affidavit, finding Hammock unavailable and emphasizing the need for cross-examination on the contested issue of adaptive functioning. The PCR court found Dr. Hall's testimony to be thorough and credible. The PCR court also found that Aleksey failed to prove he satisfied all three prongs of the intellectual disability standard and denied relief. The PCR court later denied Aleksey's Rule 59(e), SCRCP, motion.

## II.     Standard of Review

"[A] trial judge's ruling regarding an *Atkins* determination will be upheld on appeal if supported by the evidence and not against its preponderance." *Blackwell*, 420 S.C. at 140, 801 S.E.2d at 720.

"In criminal cases, this Court sits to review errors of law only and is bound by factual findings of the trial court unless an abuse of discretion is shown." *Id.* at 136, 801 S.E.2d at 718 (quoting *State v. Laney*, 367 S.C. 639, 643, 627 S.E.2d 726, 729 (2006)). "An abuse of discretion occurs when the court's decision is unsupported by the evidence or controlled by an error of law." *Id.*

## III.     Intellectual Disability

Aleksey argues the PCR court erred in finding he failed to prove, by a preponderance of the evidence, that he is intellectually disabled. Aleksey contends he satisfied all three required prongs, even without the excluded Hammock affidavit. However, the evidence shows: (1) Aleksey's IQ scores during the developmental period did not reflect significantly subaverage intellectual functioning; (2) his adaptive deficits were attributed to ADHD and emotional disturbance, not intellectual disability; and (3) he did not manifest intellectual disability during the developmental period. Thus, we find the record supports the PCR court's determination.

### a.  Significantly Subaverage Intellectual Functioning

Aleksey argues the PCR court erred in relying on Dr. Hall's testimony because: (1) Aleksey's four most recent IQ tests (Tests #4–7) fall within the intellectual disability range; (2) his earlier tests (Test #1–3) are unreliable; (3) there was no basis to discount later sources for malingering or poor effort; and (4) Dr. Hall's use of the GAI was improper. We disagree.

To satisfy the first intellectual disability prong, a PCR applicant must establish significantly subaverage intellectual functioning. An IQ test is the standard measure of intellectual functioning and has a mean score of "100, which means that a person receiving a score of 100 is considered to have an average level" of functioning. *Atkins*, 536 U.S. at 309 n.5. "An IQ between 70 and 75 or lower . . . is typically considered the cutoff IQ score for the intellectual function prong of the [intellectual disability] definition." *Id.* At the same time, a "state cannot refuse to entertain other evidence of intellectual disability when a defendant has an IQ score above 70." *Moore v. Texas*, 581 U.S. 1, 12 (2017); *id.* at 14 (holding "because the lower end of

Moore's score range falls at or below 70, the [lower court] had to move on to consider Moore's adaptive functioning"); *Hall v. Florida*, 572 U.S. 701, 722–23 (2014) (agreeing "with the medical experts that when a defendant's IQ test score falls within the test's acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits" and, thus, rejecting Florida's strict cutoff of 70); *Brumfield v. Cain*, 576 U.S. 305, 316 (2015) (holding the state court's conclusion that a score of 75 precluded an intellectual disability finding was unreasonable).[8]

In *Blackwell*, we found no intellectual disability despite recent low IQ scores, relying on the following facts:

> Blackwell, *prior to the age of 18,* scored between 68 and 87 on standard school I.Q. tests; (2) Blackwell made 'reasonably sufficient grades during his school career'; (3) at the age of 18, Blackwell was found to read at the 5.8 grade level, completed arithmetic problem solving at the 6.6 level, and completed arithmetic computation at the 5.2 level; and (4) Blackwell dropped out of high school in the eleventh grade despite having earned significant credits toward graduation.

*Blackwell*, 420 S.C. at 142, 801 S.E.2d at 721 (emphasis in original).

Here, as in *Blackwell*, the developmental-period evidence is dispositive. Although Aleksey's adult IQ scores (Tests #4–7) fall within the qualifying range, his earlier scores (Tests #1–3) do not. Those scores place him well above the range typically associated with intellectual disability and weigh heavily against his claim. Further,

---

[8] The standard error of measurement is "a statistical fact, a reflection of the inherent imprecision of the test itself" and accounts for the fact that "an individual's score is best understood as a range of scores on either side of the recorded score . . . ." *Moore*, 581 U.S. at 13 (quoting *Hall*, 572 U.S. at 713); *See Hall*, 572 U.S. 701, 713 ("Individuals with intellectual disability have scores of approximately two standard deviations or more below the population mean, including a margin for measurement error (generally +5 points) . . . .[T]his involves a score of 65–75 (70 ± 5)" (quoting DSM–5, at 37)); *see e.g.*, *Moore*, 581 U.S. at 14 ("Moore's score of 74, adjusted for the standard error of measurement, yields a range of 69 to 79"). Here, we recognize the standard error of measurement and proceed with our analysis.

the divergence between earlier and later scores does not satisfy the requirement that his condition manifested during the developmental period.

Aleksey also challenges the reliability of Tests #1–3, citing incomplete documentation regarding their administration. The PCR court nevertheless credited Dr. Hall's testimony that these were standard assessments administered by trained professionals. Further, Dr. Hall did not rely on those scores in isolation. Instead, she considered them alongside Aleksey's school records, diagnoses, and developmental history. The PCR court found her testimony credible, and we defer to that determination. *Blackwell*, 420 S.C. at 140, 801 S.E.2d at 720 ("Because the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony, we must defer to the court's determinations."); *See Black v. Carpenter*, 866 F.3d 734, 748–49 (6th Cir. 2017) (holding the evidence did not support a finding of significantly subaverage intellectual functioning when childhood IQ scores ranged from 83 to 97, despite later scores of 69 and 57 in adulthood); *State v. Morrison*, 236 So. 3d 204, 225 (Fla. 2017) (holding a childhood IQ score of 78 precluded a finding of significantly subaverage intellectual functioning, despite a score of 70 at age 40).

We likewise find no error in the PCR court's acceptance of Dr. Hall's conclusions regarding malingering and effort. Dr. Hall testified Tests #4 and #5 underestimated Aleksey's functioning and that Test #6, which she administered, showed signs of malingering based on her clinical judgment, observations, and experience. Dr. Hall explained malingering as "someone intentionally producing or presenting themselves as having deficits or mental illness," while noting it differs from merely poor effort. Although Dr. Price found no malingering on Test #7, the PCR court was entitled to credit Dr. Hall's testimony. We defer to that credibility determination as well. *Blackwell*, 420 S.C. at 140, 801 S.E.2d at 720 ("Because the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony, we must defer to the court's determinations.").

Finally, Dr. Hall adequately explained her use of GAI. She testified the Full-Scale IQ test from Test #5 was uninterpretable due to variability among indices and that the Wechsler Adult Intelligence Scale (WAIS) manual directs calculation of the GAI in such circumstances using verbal comprehension and perceptual reasoning. She described this as a standard "fail safe" to obtain a valid score. Thus, the PCR court did not abuse its discretion in considering this evidence. *Id.* ("Because the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony, we must defer to the court's determinations.").

We hold the PCR court's finding that Aleksey failed to prove significantly subaverage intellectual functioning is supported by the evidence and is not against its preponderance. Because all three prongs must be satisfied, this conclusion is dispositive. We nevertheless briefly address the remaining prongs to confirm the absence of error in the PCR court's analysis.

### b. Deficits in Adaptive Functioning

The PCR court found Aleksey did not present a formal evaluation establishing deficits in adaptive functioning. Aleksey contends that, even without the Hammock affidavit, the record contains sufficient evidence to satisfy this prong. We disagree.

The second intellectual disability prong requires "significant limitations in adaptive skills such as communication, self-care, and self-direction that manifested before age eighteen." *Blackwell*, 420 S.C. at 139, 801 S.E.2d at 719 (quoting *Stanko*, 402 S.C. at 286, 741 S.E.2d at 726). It is satisfied by proof of deficits in at least one of three domains—conceptual, social, or practical—not strengths in other areas. *Moore*, 581 U.S. at 8, 137 S. Ct. at 1046. Conceptual skills include communication, academic functioning, money management, and judgment. DSM–5, at 37. Social skills include interpersonal interaction, emotional regulation, and communication. DSM–5, at 37. Aleksey does not argue he established deficits in practical functioning.

In *Blackwell*, this Court agreed with the trial court that the defendant did not have significant deficits in adaptive functioning because Blackwell's grades were reasonably sufficient. *Blackwell*, 420 S.C. at 142, 801 S.E.2d at 721. At age eighteen, Blackwell had a reading grade level of 5.8, an arithmetic problem-solving level of 6.6, and an arithmetic computation level of 5.2. *Id.* Blackwell also dropped out of school in the eleventh grade. *Id.* Additional evidence also showed Blackwell was not diagnosed with mental retardation during the relevant period, maintained steady employment as a commercial truck driver, raised two children during a lengthy marriage, and functioned independently at home before age eighteen. *Blackwell*, 420 S.C. at 142–23, 801 S.E.2d at 721.

Similarly, in *Green*, the Fourth Circuit Court of Appeals found no significant adaptive deficits where the defendant demonstrated functional independence across multiple domains. *Green v. Johnson*, 515 F.3d 290, 302 (4th Cir. 2008). There, the defendant communicated effectively during interviews, made sophisticated library requests, explained commissary errors in writing, managed money and savings

accounts, paid rent, used money orders, obtained a driver's license, and concealed criminal activity. *Id.*

Here, although Aleksey points to academic struggles and social difficulties, the record reflects substantial evidence of adaptive functioning. As in *Green*, Aleksey paid rent and bills, used money orders, and maintained a household by cleaning, cooking, and doing the laundry. *Id.* The record further shows Aleksey performed routine domestic tasks and learned and retained new skills.

Dr. Hall also found that Aleksey's written communications from prison reflected organization, coherence, and reasoning inconsistent with significant adaptive deficits. She attributed his documented difficulties to ADHD and environmental factors, rather than intellectual disability. The PCR court credited this testimony, and we defer to that determination.

On this record, and in the absence of a formal adaptive functioning evaluation contradicting Dr. Hall's conclusions, the PCR court did not err in finding Aleksey failed to carry his burden on this prong.

### c. Onset During Developmental Period

The third prong of intellectual disability requires onset during the developmental period. Aleksey contends the record shows such a manifestation through his school records and argues his childhood IQ scores (Tests #1–3) are neither dispositive nor reliable. The record does not support that conclusion.

This intellectual disability prong does not require a formal diagnosis or specific IQ score during childhood. *See Blackwell*, 420 S.C. at 172, 801 S.E.2d at 737 (Pleicones, A.J., dissenting) ("The absence of records indicating a diagnosis of intellectual disability prior to the age of eighteen cannot suffice to rule out such a diagnosis."). Rather, the inquiry is whether the intellectual disability manifested during the developmental period. *Stanko*, 402 S.C. at 286, 741 S.E.2d at 726; *Atkins*, 536 U.S. at 318.

Here, every IQ score from the developmental period falls well above the range associated with the intellectual disability (96, 82, and 90 (Tests # 1–3)). No contemporaneous diagnosis suggests intellectual disability, despite multiple educational and psychological evaluations. Taken together, the PCR court did not err in finding Aleksey failed to carry his burden on this prong. *See Carpenter*, 866 F.3d at 748–49 (holding the evidence did not support a finding of significantly

subaverage intellectual functioning where childhood IQ scores ranged from 83 to 97, despite later scores of 69 and 57 in adulthood); *Morrison*, 236 So. 3d at 225 (holding a childhood IQ score of 78 precluded a finding of significantly subaverage intellectual functioning, despite a score of 70 at age 40).

Accordingly, we hold the PCR court's finding that Aleksey failed to prove the three required prongs is supported by the evidence and is not against its preponderance.

## IV. Exclusion of Hammock Affidavit

Aleksey also contends the PCR court abused its discretion in excluding the Hammock affidavit. We disagree.

A PCR court "may receive proof by affidavits, depositions, oral testimony or other evidence . . . ." S.C. Code Ann. § 17–27–80 (2014). "Whether to admit such evidence is within the court's discretion." *Simpson v. Moore*, 367 S.C. 587, 607, 627 S.E.2d 701, 712 (2006), *abrogated on other grounds by Smalls v. State*, 422 S.C. 174, 810 S.E.2d 836 (2018)). We will not reverse the PCR court's decision "absent an abuse of discretion resulting in prejudice to a party." *McKnight v. State*, 378 S.C. 33, 56, 661 S.E.2d 354, 365 (2008).

The weight assigned to adaptive functioning evaluations is based on the "court's assessment and credibility determination of the expert testimony." *Blackwell*, 420 S.C. at 142 n.11, 801 S.E.2d at 721 n.11; see *id.* at 140, 801 S.E.2d at 720 ("Because the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony, we must defer to the court's determinations."). In *Simpson*, we upheld the admission of extensive affidavit and deposition testimony in lieu of live witnesses, noting the decision fell within the PCR court's discretion and caused no prejudice to the State. 367 S.C. at 607–08, 627 S.E.2d at 712. There, "most of the relevant witnesses testified at the PCR hearing and were cross-examined by the State," and "the court gave the State the opportunity to submit additional testimony and affidavits countering the evidence presented by Simpson." *Id.* at 608, 627 S.E.2d at 712.

Here, the PCR court excluded the Hammock affidavit because its scope, context, and adequacy could not be "adequately addressed without cross-examination and/or other challenges." The PCR court also found the Hammock affidavit was Aleksey's only evidence on adaptive functioning. Relying on *United States v. Candelario-Santana*, the PCR court emphasized the importance of courts making their "own independent determinations of the clinicians' judgment and credibility" for an

adaptive functioning analysis, given that adaptive functioning is subjective and more amorphous than intellectual functioning. *United States v. Candelario-Santana*, 916 F. Supp. 2d 191, 211–12 (D.P.R. 2013); *id.* at 204–05 (holding expert testimony on adaptive functioning was unreliable where the expert was combative, seemed unwilling to explain evidence, and had errors in its findings).

Aleksey argues that the PCR court's decision to leave the record open for the State to submit additional testimony and affidavits countering the evidence presented, as in *Simpson*, sufficiently addressed the State's concerns. We believe the need for cross-examination and the PCR court's credibility assessment, given the contested basis of the adaptive functioning prong, sufficiently supported the PCR court's exclusion of the affidavit. Given the contested nature of adaptive functioning, we cannot say the PCR court abused its discretion in excluding the affidavit.

Even if admitted, the Hammock affidavit would have addressed only one prong of the intellectual disability inquiry. As stated, Aleksey failed to prove the remaining requirements. Its exclusion, therefore, did not prejudice the outcome.

We decline to address Aleksey's additional arguments regarding the exclusion of the Hammock affidavit. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (holding an appellate court need not address remaining issues when disposition of a prior issue is dispositive).

## V.     Alternate Sustaining Ground

We also decline to address the State's alternate sustaining ground that Aleksey's PCR action was untimely and successive. *See I'On, L.L.C. v. Town of Mt. Pleasant*, 338 S.C. 406, 420, 526 S.E.2d 716, 723 (2000) ("It is within the appellate court's discretion whether to address any additional sustaining grounds."); *id.* ("An appellate court may not rely on Rule 220(c), SCACR, . . . when the court believes it would be unwise or unjust to do so in a particular case."); *Futch*, 335 S.C. at 613, 518 S.E.2d at 598 (holding an appellate court need not address remaining issues when disposition of a prior issue is dispositive).

## VI.     Conclusion

We hold the PCR court's finding that Aleksey did not prove he is intellectually disabled is supported by the evidence and is not against its preponderance. We further find the PCR court did not abuse its discretion in excluding the Hammock affidavit. The PCR court's decision is therefore

**AFFIRMED.**

**KITTREDGE, C.J., JAMES, HILL, JJ., and Acting Justice Matthew Price Turner, concur.**